**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

|  |  |
|---|---|
| Zdenek Bakala,<br><br>        *Plaintiff,*<br><br>    -against-<br><br>Pavol Krupa, Adam Swart, and Crowds on Demand LLC,<br><br>        *Defendants.* | Case No. 9:18-cv-02590-DCN<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Zdenek Bakala, by his attorneys, alleges against Defendants Pavol Krupa, Adam Swart, and Crowds on Demand LLC as follows:

**NATURE OF ACTION**

1.      This is a case about extortion.  Defendants are pursuing a campaign of harassment, defamation, and interference in the business affairs of Zdenek Bakala, which they have expressly vowed to expand unless he pays them millions of dollars.  By this action Mr. Bakala seeks to put an end to this unlawful behavior and obtain compensation for the damage Defendants have caused.

**THE PARTIES**

2.      Plaintiff Zdenek Bakala is a citizen of both the United States and the Czech Republic.  Mr. Bakala has a residence in Hilton Head, South Carolina.

3.      Defendant Crowds on Demand LLC ("Crowds on Demand") is an LLC organized and existing under the laws of the State of California, having its principal place of business located at 8484 Wilshire Blvd., Suite 515, Beverly Hills, CA 90211.  Upon information and belief, Crowds on Demand operates throughout the United States, including in South Carolina, California, New York, Nebraska, Washington, D.C., Nevada, and Louisiana.

4.      Adam Swart is the founder and CEO of Crowds on Demand and, upon information and belief, resides in California.

5.      Upon information and belief, Defendant Pavol Krupa is a Slovakian citizen residing in the Czech Republic.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiff's claims for extortion pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(a).

7.      This Court has subject matter jurisdiction over Plaintiff's claims for defamation and tortious interference pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties to this action, and the amount in controversy, without interest and costs, exceeds the sum value specified by 28 U.S.C. § 1332(a).

8.      This Court has personal jurisdiction over Defendant Crowds on Demand. Assertion of personal jurisdiction over Crowds on Demand is consistent with the South Carolina Long-Arm Statute and the U.S. Constitution because Mr. Bakala's claims arise out of Crowds on Demand's contacts with the District of South Carolina, which constitute sufficient minimum contacts such that subjecting it to personal jurisdiction in this forum does not offend traditional notions of fair play and substantial justice.   For example, as alleged below, Crowds on Demand committed tortious acts in whole or in part in South Carolina, including by harassing and defaming Mr. Bakala in Hilton Head, South Carolina.  Further, as alleged below, Crowds on Demand committed an intentional tort from which Mr. Bakala experienced the brunt of the harm in South Carolina, and Crowds on Demand aimed its tortious conduct at South Carolina, such that South Carolina was the focal point of the tortious activity.

9.      This Court has personal jurisdiction over Defendant Adam Swart.  Assertion of personal jurisdiction over Mr. Swart is consistent with the South Carolina Long-Arm Statute

and the U.S. Constitution because Mr. Bakala's claims arise out of Mr. Swart's contacts with the District of South Carolina, which constitute sufficient minimum contacts such that subjecting him to personal jurisdiction in this forum does not offend traditional notions of fair play and substantial justice.  For example, as alleged below, Mr. Swart committed tortious acts in whole or in part in South Carolina, including by harassing and defaming Mr. Bakala in Hilton Head, South Carolina.  Further, as alleged below, Mr. Swart committed an intentional tort from which Mr. Bakala experienced the brunt of the harm in South Carolina, and Mr. Swart aimed his tortious conduct at South Carolina, such that South Carolina was the focal point of the tortious activity.

10.    This Court has personal jurisdiction over Defendant Pavol Krupa.  Assertion of personal jurisdiction over Mr. Krupa is consistent with the South Carolina Long-Arm Statute and the U.S. Constitution because Mr. Bakala's claims arise out of Mr. Krupa's contacts with the District of South Carolina, including through the acts of his agents, which constitute sufficient minimum contacts such that subjecting him to personal jurisdiction in this forum does not offend traditional notions of fair play and substantial justice.  For example, as alleged below, Mr. Krupa committed tortious acts in whole or in part in South Carolina, including causing Mr. Bakala to be harassed and defamed in Hilton Head, South Carolina, after Mr. Bakala refused to pay him extortion money.  Further, as alleged below, Mr. Krupa committed an intentional tort from which Mr. Bakala experienced the brunt of the harm in South Carolina, and Mr. Krupa aimed his tortious conduct at South Carolina, such that South Carolina was the focal point of the tortious activity.

11.    Venue is proper in the District of South Carolina pursuant to 18 U.S.C. § 1965(a) and (b), as well as 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events giving rise to this action occurred in this judicial district; because Defendants transact affairs

in this judicial district; and because the ends of justice require that Defendants be brought before this Court in light of Defendants' extortionate activity occurring in this jurisdiction.

## FACTS

### Zdenek Bakala's History of Entrepreneurship and Civic Engagement

12.     Zdenek Bakala is a successful businessman and active philanthropist. Born in 1961 in what was then Czechoslovakia, Mr. Bakala grew up under an authoritarian communist regime. When he was nineteen, Mr. Bakala fled Czechoslovakia and eventually emigrated to the United States. In the United States, Mr. Bakala moved to California where he worked as a dishwasher in a restaurant, learned English, and took community college classes. Mr. Bakala eventually obtained an economics degree from the University of California, Berkeley, and later an MBA from the Tuck School of Business at Dartmouth College. Mr. Bakala became a United States citizen in 1986.

13.     After graduating from business school, Mr. Bakala worked in the United States as an investment banker at Drexel Burnham Lambert and Bank of America, and then at Credit Suisse First Boston in London. Credit Suisse First Boston subsequently asked Mr. Bakala to establish and manage a Czech branch in Prague.

14.     Between 1989 through 1993 (while Mr. Bakala was starting his career in investment banking in the United States, London, and Prague), Czechoslovakia was undergoing the Velvet Revolution and peacefully transitioning from communism to a country with a market-led economy, which would become the Czech Republic.[1] This transition was led by Vaclav Havel, who served as the president of Czechoslovakia from 1989-1992 and as the first president of the Czech Republic from 1993-2003.

---

[1] In 1993, Czechoslovakia split into the independent countries of the Czech Republic and the Slovak Republic.

15.    In 1994, after leaving Credit Suisse First Boston, Mr. Bakala co-founded the Czech Republic's first private investment bank, Patria Finance.  Through his work with Credit Suisse First Boston and Patria Finance, Mr. Bakala played a key role in the growth and stabilization of capitalism in the Czech Republic, including through his work on privatizing and restructuring Czech companies such as the major European carmaker Skoda Auto, which is now the largest private employer in the Czech Republic.  Mr. Bakala was also instrumental in establishing the Prague Stock Exchange, where he served on the Exchange Chamber.  Mr. Bakala sold Patria Finance to a Belgian banking group in 2001, and in 2004, Mr. Bakala and partners established RPG Industries, a private equity fund focused on business and investment opportunities in the Czech market.

16.    Despite early success in establishing a democratic and market-led country, the Czech Republic has faced serious challenges in recent years.  Some attribute this to public corruption and authoritarian influences.[2]  While the country used to be "lionized for its democratic credentials," recent elections have produced results that call into question its commitment to the rule of law and basic rights.[3]  Outside observers also have expressed concerns over the government's undue influence over the media.[4]

17.    Inspired by his experiences in the United States, Mr. Bakala has always been a strong supporter of democracy, human rights, as well as government and economic transparency in the Czech Republic.  Mr. Bakala owns RESPEKT, an influential Czech magazine, which regularly covers stories of government corruption ignored by other Czech

---

[2]    David Frum, *The Toxic Politics of Migration in the Czech Republic*, THE ATLANTIC (Oct. 23, 2017), https://www.theatlantic.com/international/archive/2017/10/czech-elections/543669/.

[3]    Adam Ereli, *The Teetering Czech Journey in Europe*, U.S. NEWS & WORLD REPORT (Feb. 15, 2018), https://www.usnews.com/news/best-countries/articles/2018-02-15/west-must-hold-czech-republic-accountable-to-democratic-norms.

[4]    REPORTERS WITHOUT BORDERS FOR FREEDOM OF INFORMATION, https://rsf.org/en/czech-republic (last visited Aug. 20, 2018).

media (many of which are owned by Czech Prime Minister Andrej Babis).  In 2007, Mr. Bakala and his wife Michaela established the Bakala Foundation, which among other things supports investigative journalism training for aspiring Czech journalists. The Bakala Foundation also provides scholarships to high-achieving Czech students looking to study abroad at prestigious universities.  Mr. Bakala provided financial support for the establishment of The Aspen Institute Central Europe, an international nonprofit and non-partisan think tank dedicated to policy innovation, leadership, and international cooperation.  Mr. Bakala supports the Vaclav Havel Library in Prague, dedicated to the legacy of the first president of the Czech Republic. Mr. Bakala is also a member of the Board of Advisors of the Tuck School of Business at Dartmouth College, as well as a board member of The Design Museum in London and a partner of the Dox Centre for Contemporary Art in Prague.  Mr. Bakala has publicly and transparently made campaign contributions to pro-Western, pro-freedom political parties and individuals. However, as discussed below, Mr. Bakala's fight against illiberalism and corruption in the Czech Republic has made him a target for harassment by reactionary forces.

### *OKD Privatization*

18.     When the Czech Republic emerged from communism following the Velvet Revolution of 1989, many of the country's state-owned assets were privatized.  OKD was the largest hard coal mining company in the country and owned numerous mines in the coal-rich Ostrava region.  Initially, the Czech government retained a majority stake in OKD (with part of this majority stake transferred to municipalities).  Communist-era managers amassed a significant minority stake in OKD through the privatization process and then gained full control over OKD in June 1996 after the Czech government voluntarily sold a decisive portion of its shares in the company back to OKD for the nominal amount of one Czech crown.

19.     In 2004, Karbon Invest (owned by the former managers of the mines) bought the Czech government's remaining 46% stake in OKD, resulting in Karbon Invest owning over

95% of the shares of OKD.  Some critics alleged that Karbon Invest did not pay a high enough price to the Czech government to acquire the government's 46% stake in OKD.  However, an investigation by the European Commission concluded that the Czech government received an appropriate price for its shares.  Further, in May 2018, a Czech court rejected charges that a valuation expert hired in 2004 had undervalued the shares that the Czech government had sold to Karbon Invest.[5]

20.    After Karbon Invest completed the purchase of government shares of OKD, an international group of investors which included Mr. Bakala purchased Karbon Invest.  Under the group's ownership, the business was restructured, with certain functions divided into separate assets.  For example, the coal mines, transportation assets, and apartment buildings that had been included by the Czech government in the privatization of OKD were all divided into separate companies.

21.    Included in the OKD assets that the investment group purchased in 2004 were residential blocks containing approximately 43,000 apartments in the Moravia-Ostrava region of the Czech Republic.  These apartments, built during the communist era, were in very poor condition.  The new company invested hundreds of millions of dollars in renovation and improvement of the apartments.  There were rumors, spread in part by Czech politicians, that tenants would have the right to purchase their individual apartments for below-market prices.  Mr. Bakala publicly opined that selling the apartments to the tenants was a possibility.  However, there was no right to purchase in any contract to which Mr. Bakala (or any company in which he was an investor) was a party.  There was a "right of first refusal" clause in the 2004 contract whereby Karbon Invest bought the Czech government's minority stake, under which the tenants would have a right of first refusal *should the building be subdivided into individual*

---

[5]  Chris Johnstone, *Czech Court Clears Accused Over OKD Sale, Controversy Set to Continue*, CZECH RADIO (July 5, 2018), https://www.radio.cz/en/section/curraffrs/czech-court-clears-accused-over-okd-sale-controversy-set-to-continue.

*units and sold individually*, but not if the apartment blocks changed hands pursuant to an equity transaction. The buildings were never subdivided into individual units of property, and there was no obligation on any party to subdivide the buildings into individual units. Indeed, a 2009 audit commissioned by the Czech Ministry of Finance concluded that all obligations from this 2004 contract had been and were being met. In 2015, Mr. Bakala and his partners sold 100% of their equity interest in the company that owns, *inter alia*, the OKD apartment buildings to a company owned indirectly by Round Hill Capital and Blackstone.

22.     When Mr. Bakala and his partners purchased OKD in 2004, coal prices were low. Coal prices rose over the next four years, and the initial public offering ("IPO") of New World Resources ("NWR"), OKD's new parent company, was one of the largest of 2008 on the London Stock Exchange. However, in subsequent years, global coal prices began to decline and OKD eventually found itself in financial difficulty. This level of financial distress was not a problem unique to OKD or to the Czech Republic. Coal prices fell over 60% between 2011 and 2016, and numerous coal companies filed for bankruptcy protection, including industry giant Peabody Energy in the United States.[6] As part of a broader restructuring in 2014, Mr. Bakala and his partners injected about €35 million (approximately $41 million) of their own money to try to support OKD during the downturn and buy the company time to await a recovery in coal prices. Despite the contribution of additional funds from Mr. Bakala and his partners, OKD (like the coal industry overall) remained in financial distress.

23.     Meanwhile, the free market democracy championed by the Czech Republic's first President, Vaclav Havel, came under pressure as well. A President with "authoritarian instincts," who was "comfortable in supporting the Kremlin's agenda," took office, and, along

---

[6]  Dana Varinsky, *Nearly half of US coal is produced by companies that have declared bankruptcy*, BUSINESS INSIDER (Dec. 9, 2016), https://www.businessinsider.com/us-coal-bankruptcy-trump-2016-12.

with a new Prime Minister, began taking actions that many observers viewed as systematically undermining the rule of law and democratic institutions in the Czech Republic.[7]

24.    In 2016, just as coal prices were beginning to show signs of recovery, the Czech government took steps to re-nationalize OKD by pressing Mr. Bakala and his partners to forfeit their stake in the company, and then steering OKD into insolvency.  Following sham restructuring proceedings in Czech courts, OKD was sold in early 2018 to Prisko, a company wholly owned by the State Treasury of the Czech Republic.  Alcentra (affiliated with BNY Mellon group) offered to purchase OKD for 500 million Czech crowns (approximately $23 million), but that offer was inexplicably rejected,  and Prisko was able to acquire OKD's assets for about 80 million crowns (approximately $3.7 million).  OKD was worth far more than that considering the continued recovery in coal prices, and indeed was appraised at a value of more than 500 million crowns.  Moreover, OKD was estimated to have already accumulated over 2.5 billion crowns in cash (approximately $115 million).

### *Pavol Krupa Launches Harassment Campaign Against Zdenek Bakala*

25.    Pavol Krupa is a Slovak businessman and the founder of a company called Arca Capital, as well as a newly established company called Krupa Global Investments.  Krupa has a history of engaging in attempted "shakedowns" of companies and individuals.  For example, Krupa has waged a publicity campaign against GE with the hopes of receiving a payout.  In January 2018, Krupa's application to manage an investment fund ("Arca Capital CEE") was rejected by the Czech National Bank, on the grounds that Krupa is insufficiently trustworthy.[8]

---

[7] Adam Ereli, *The Teetering Czech Journey in Europe*, U.S. NEWS & WORLD REPORT (Feb. 15, 2018), https://www.usnews.com/news/best-countries/articles/2018-02-15/west-must-hold-czech-republic-accountable-to-democratic-norms.

[8] Pavel P. Novotny, *Divoke leto Pavola Krupy: odchod z Arca Capital i najezd s miliardarem Icahnem*, FORBES (Aug. 9, 2018), http://www.forbes.cz/divoke-leto-pavola-krupy-odchod-z-arca-capital-i-najezd-s-miliardarem-icahnem/.

26.    Over the past several years, Krupa has engaged in an extended campaign of harassment, extortion, and defamation against Mr. Bakala.  These attacks have escalated and intensified over time, and appear to be backed by populist politicians opposed to Mr. Bakala's anti-corruption and pro-Western activities.

27.    Krupa convinced some tenants in the OKD apartments to sign over to an Arca company their legal claim to sue for the alleged violation of their right of first refusal. However, many other tenants declined to assign any legal rights to Krupa's company, complaining that Krupa was demanding 50% of any recovery.[9]  The Arca company then initiated frivolous lawsuits against Residomo s.r.o. (the current owner) and RPG Industries Limited, a Cyprus company, which formerly owned the shares of the OKD company.  These lawsuits are ongoing.

28.    In June 2017, Krupa threatened a demonstration in front of Mr. Bakala's house in Switzerland and offered to hire a bus to transport protestors (including notorious football hooligans) from the Ostrava region of the Czech Republic to Switzerland.[10]  Although the demonstration never ultimately occurred, Mr. Bakala and his family, fearing for their safety and on the recommendation of local police, were forced to leave their home during the week in question and hire additional security.

29.    Krupa has publicly taken credit for launching—through his company, Arca Capital—criminal investigations against Mr. Bakala.  Krupa repeated the assertion that he is behind criminal proceedings against Mr. Bakala in a letter to global valuation and corporate finance firm Duff & Phelps in 2017, wherein Krupa also listed other formal complaints that he engineered in an effort to put pressure on Mr. Bakala.

---

[9]  *Miliardář Krúpa chystá demonstraci horníků OKD ve Švýcarsku*, BLESK.CZ (April 20, 2017), https://www.blesk.cz/clanek/zpravy-live-zpravy/463948/miliardar-krupa-chysta-demonstraci-horniku-okd-ve-svycarsku.html?utm_source=blesk.cz&utm_medium=copy.

[10]  *Id.*

30.    Krupa actively promotes several Facebook pages that harass and defame Mr. Bakala and accuse him of fraud.  For example, Krupa sent one of the Facebook pages to Duff & Phelps, the liquidators of OKD's parent company, in an attempt to interfere with Mr. Bakala's business relationships.  The comment section of these Facebook pages contain dozens of death threats against Mr. Bakala, including numerous comments explicitly stating that he should be shot, hanged, bludgeoned, or decapitated.[11]

31.    These Facebook pages are promoted by Krupa and, upon information and belief, are administered at Krupa's direction. For example, one of the Facebook pages is called Narodni Zajem ("National Interest"), and the website narodnizajem.com is registered to Arca Capital, Krupa's company.  The administrator of the Narodni Zajem page has participated in

---

[11]    A sample of the over 70 death threats have been posted on Facebook pages between April 2017 and August 2018 include (translated into English from original Czech and with profanity redacted):

- April 11, 2017: Hey, who will kill Bakala?  That m**********r
- April 14, 2017: If someone killed that m*********r tomorrow, it would be too late! Best swine!!!
- April 18, 2017: and this is why democracy can't function…cut off his head and nationalize his property
- April 20, 2017: That m*********r doesn't deserve anything other than a 9mm hole between his eyes
- April 20, 2017: Kill that a*****e
- May 31, 2017: Sniper looking for a job
- June 1, 2017: throw him into a stone crusher
- June 1, 2017: Shoot that swine!
- June 2, 2017: There is water already boiling for every swine, kill hang this man will die everyone knows where to find him
- June 7, 2017: If I had more money than I have now and somebody gave me a tip for bakala's palace abroad I would burn it down and rob him too, dirty whore bakala, m*********r prick
- June 4, 2017: Seize the property and a bullet to the head
- September 14, 2017: I would hang him for this
- June 18, 2018: Shoot this f*****g m**********r he deserves nothing else
- June 19, 2018: First poke his eyes out so that he cannot enjoy his f*****g fortune anymore
- June 20, 2018: My father was working in Bezruc shaft for over 30 years does anyone have the address where this f*****g bakala is located I could definitely help you
- August 12, 2018: 9mm
- August 22, 2018: Up against the wall like Ceausescu
- August 22, 2018: Immediately up against the wall and a bullet

the comment sessions, saying that something needs to be done and at times actively "liking" various death threats.  On April 13, 2017, the administrator of the page posted a picture of Mr. Bakala's house in Switzerland.  Upon information and belief, the administrator of the page was acting under the direction of Krupa.

*Krupa Demands Payment To End Harassment Campaign*

32.     In April 2017, Krupa contacted an attorney associated with Mr. Bakala.  In communications which followed, Krupa stated that Mr. Bakala could end the harassment campaign by paying money to Krupa of a then-unspecified amount.

33.     At a June 28, 2017 meeting with the attorney, Krupa explained to the attorney that he had hired Pinkerton, a private detective agency, to seek information to use against Mr. Bakala.  Krupa stated that he would continue his campaign against Mr. Bakala in Europe and planned to focus his efforts on the United States next.

34.     At the June meeting, the attorney responded to Krupa stating that he did not have a mandate from Mr. Bakala, but that he did not think Mr. Bakala would pay anything and would utilize his commercial and legal team to fight the harassment coming from Krupa.

35.     In September 2017, Krupa prodded the attorney for an additional response, and eventually told the attorney that if he did not receive a favorable answer, he would target Mr. Bakala in the United States.

36.     Krupa and the attorney met again on September 19, 2017.  Krupa declared that if Bakala paid him 500 million Czech crowns (approximately $23 million), as a purported purchase of (then worthless) stock shares owned by his company Arca Capital, Krupa would: stop all actions abroad; not supply materials that he said had been requested by authorities in London; abandon plans for new actions in the US and Norway; cease all "public relations" activities; abandon a private investigation into NWR's IPO; withdraw legal petitions; and cease cooperation in filed criminal complaints.

37.    On October 3, 2017, Krupa and the attorney met again, and Krupa explained that his campaign against Mr. Bakala had attracted the interest of the Czech President, who wished to coordinate with him, in hopes of generating something that could be used against a rival politician.  Krupa explained that he thought it would be best for Mr. Bakala to pay him directly, and that this could be done on a handshake without the involvement of lawyers.  Krupa repeated his offer to cease his campaign in exchange for 500 million crowns, either in cash, via "stock purchase" from Arca Capital, or by some unspecified cooperative deal.  When the attorney asked Krupa to put his proposal in writing, Krupa responded by sending the attorney a document on or about November 17, 2017.

38.    The document from Krupa outlined the harassment campaign and future activities planned for the United States.  In particular, the document detailed Krupa's threat to transfer "all activities" from the Czech Republic to other countries with which Mr. Bakala has ties, including the United States.

39.    In November 2017, Krupa told the attorney that his activities abroad were just beginning.  Krupa also said he was waiting for a response to his proposed offer.  Mr. Bakala rejected Krupa's "offer," and Krupa was informed that he would not be paid.

***Crowds on Demand and Adam Swart Continue Campaign of Harassment***

40.    Upon information and belief, after being informed that Mr. Bakala would not pay the extortion money, Krupa hired Swart and Crowds on Demand to bring his campaign of defamation, extortion, and harassment to the United States.

41.    Crowds on Demand is a firm founded by Adam Swart in 2012.  Among other things, Crowds on Demand hires actors to play the part of protestors or supporters at political rallies.  Crowds on Demand describes its services as follows:

> If you need to hire protestors, we can get a crowd on the street, sometimes within 24 hours time.  If you need speakers to present at a council meeting, we can provide talented and well-spoken individuals to advocate for the cause.  We also have a dedicated team of phone-banking staff who can call Congressional

Offices and convince government officials to support your cause and help you overcome opposition. If you need lots of letters and emails written from constituents, we have a network of tens of thousands of individuals across the country who can send well-written constituent letters to their representatives.[12]

42.     Crowds on Demand's activities are often referred to as "astroturfing." "Astroturfing" is an "organized activity that is intended to create a false impression of a widespread, spontaneously arising, grassroots movement in support of or in opposition to something (such as a political policy) but that is in reality initiated and controlled by a concealed group or organization (such as a corporation)."[13]

43.     A case study posted by Crowds on Demand on its website includes the following:

**Presidential Public Opinion.** A foreign government hired Crowds on Demand to help generate a positive reception for its newly elected leader during the UN General Assembly. The concern was ensuring that the leader was well received by a US audience and confident for his work at the UN. We created demonstrations of support with diverse crowds. We also used the media primarily local and national outlets to bring more attention to these demonstrations which led to a mostly positive portrayal. The crowds that we deployed drew in more supporters creating a strong presence for this leader at the UN and an improved perception of him by the American public.

44.     Upon information and belief, Swart and Crowds on Demand have never registered under the Foreign Agents Registration Act ("FARA"), despite acting as the agent of Krupa and other foreign principals, such as the foreign government described above. FARA, the violation of which carries criminal penalties, requires agents of foreign principals engaging in the types of activities in which Swart and Crowds on Demand are engaged to register with

---

[12]    *Protests, Rallies, and Advocacy*, CROWDS ON DEMAND, https://crowdsondemand.com/protests-rallies-and-advocacy/ (last visited July 19, 2018)

[13]    *Definition of Astroturfing*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/astroturfing (last visited July 19, 2018).

the Department of Justice and file forms outlining their agreement with, income from, and expenditures on behalf of the foreign principal.[14]

45.    Another case study highlighted by Crowds on Demand's website is the following:

> **Crippling a Child-Molester Owned Business.** Crowds on Demand was hired by the competitor of a large manufacturing business owned by a convicted child molester to cripple his operations.  We did this by protesting the business and all of its clients (in an effort to get the clients to cease working with the business).  We deployed protestors with signs to the headquarters of all clients and complemented that with a strong phone-banking operation.  We even found the phone number of one of the client's rabbis and used the rabbi to reach the client to tell him to stop doing business with the child molester.  Within 3 weeks, all his largest clients had left him and he sold the business to our client for 5% of its previous value.

46.    According to media reports, paid actors employed by Crowds on Demand disrupted a New Orleans city council vote related to approval for building a new power plant.[15] Professional actors were paid $60 to wear orange shirts and attend city council meetings.  Some were paid $200 for a "speaking role," which involved giving a pre-written speech at the meeting.  The article includes a quote from Adam Swart emphasizing the importance of persistent harassment:  "When the targets of our actions see that we're going to be back, day after day, they get really scared…We're in it for the long haul, and the problem's not going to go away on its own."[16]

---

[14]    *General FARA Frequently Asked Questions*, UNITED STATES DEPARTMENT OF JUSTICE (Aug. 21, 2017), https://www.justice.gov/nsd-fara/general-fara-frequently-asked-questions; *see also* 22 U.S.C. § 611.

[15]    Al Tompkins, *The 'hire a crowd' business operates openly and makes journalism even more difficult*, POYNTER (May 21, 2018), https://www.poynter.org/news/hire-crowd-business-operates-openly-and-makes-journalism-even-more-difficult.

[16]    *Id.*

47.     Swart has bragged about his success in using fake protests to coerce monetary payments from his targets: "When a client spends $10,000 on a protest and wins a $20 million settlement, that's a clear return on investment."[17]

48.     Crowds on Demand has recently drawn the attention of John Oliver, the host of HBO's "Last Week Tonight," who recently profiled Crowds on Demand and its dishonest tactics.[18]  Oliver characterized Swart's business as: "sophisticated, effective, and dangerous." Oliver continued: "Astroturfing is a serious threat to our public discourse."[19]

### Harassment Campaign and StopBakala.org

49.     Krupa has publicly stated that he intends to pursue Mr. Bakala (translated) "as a wolf, as a wild dog … in the United States."

50.     During the summer of 2018, Krupa, Swart, and Crowds on Demand escalated their harassment campaign against Mr. Bakala in the United States by creating a website filled with false and defamatory content.  Defendants publicized their defamatory website by emailing links to the website to many of Mr. Bakala's business and philanthropic contacts, as well as including the website's address on signs carried by paid "protestors."  This conduct is described in detail below.

51.     Krupa, along with Swart and Crowds on Demand, created the website: https://www.stopbakala.org/.  Swart and other individuals connected to Crowds on Demand have sent emails containing a link to StopBakala.org, which they describe as "our website."

---

[17]    Kieron Monks, *The lucrative business of crowds for hire*, CNN (Jan. 3, 2018), https://www.cnn.com/2015/10/16/business/crowds-for-hire/index.html.

[18]    John Oliver, *Astroturfing: Last Week Tonight with John Oliver (HBO)*, LAST WEEK TONIGHT (Aug. 12, 2018), https://www.youtube.com/watch?v=Fmh4RdIwswE&feature=youtu.be&t=11m12s (starting at 11:12)

[19]    Sean Smyth, *John Oliver says 'astroturfing' is 'serious threat to our public discourse'*, BOSTON GLOBE (Aug. 13, 2018), https://www.bostonglobe.com/arts/television/2018/08/13/john-oliver-says-astroturfing-serious-threat-our-public discourse/Ee8UrK6AK2ZqzyP757EobO/story.html.

The content on StopBakala.org matches nearly verbatim the content of non-public communications that Krupa and Arca Capital are known to have made. For example, StopBakala.org includes a reference to an alleged investigation by the United Kingdom's Financial Conduct Authority and Serious Fraud Office, despite the fact that neither of these entities has ever indicated that they are investigating Mr. Bakala or OKD (and upon information and belief, there is no such investigation). Krupa has previously made this same false and defamatory allegation.

52. StopBakala.org contains numerous false, defamatory and harassing statements. For example, the first page of StopBakala.org states that Mr. Bakala is a "criminal" and that "[h]e bought a major state owned asset (OKD mining) for a fraction of its value from the Czech government. How did he do it? Simple: in secret and by bribing government officials."[20] This statement is false and defamatory. Mr. Bakala is not a "criminal," he did not purchase OKD mining from the Czech government, he did not bribe any government officials, and his purchase of Karbon Invest was not done in "secret." Defendants knew that these statements were false at the time they created the StopBakala.org website and at the time they publicized that website, or Defendants made and publicized these statements in reckless disregard of the truth.

53. The first page of StopBakala.org also states that Mr. Bakala "lied to coal miners about giving them discounted housing as part of the deal with the government to buy OKD. He said they would be able to buy their housing units for reasonable prices. Unsurprisingly, this deal wasn't honored because he secretly sold these units to Round Hill Capital and the Blackstone Group (backed by M&T Bank/Wilmington Trust)."[21] Another page of the

---

[20] COALITION TO PROTECT OKD MINERS, https://www.stopbakala.org/ (last visited Aug. 20, 2018).
[21] *Id.*

StopBakala.org website states that "[o]f all of Bakala's deeds, none is so loathsome and detestable as cheating blue collar Czech miners out of their homes."[22] It also states that "[w]hen Bakala (under very suspicious circumstances) purchased half of OKD from the state in 2004, Bakala promised that according to the conditions stated in the sales contract, he will let all the tenants buy the housing units from him for the same price that he purchased them for himself."[23]

54.    The above statements are false and defamatory.  Mr. Bakala never made a "promise" or a "deal" with coal miners to give them a right to purchase their apartments at a discounted price.  Nor did Mr. Bakala purchase OKD from the Czech government—he and his partners purchased Karbon Invest from two former managers of the mine, and it was those managers of the mine who purchased the Czech government's shares of OKD.  Defendants knew that these statements were false at the time they created the StopBakala.org website and at the time they publicized that website, or Defendants made and publicized these statements in reckless disregard of the truth.

55.    The first page of StopBakala.org states that Mr. Bakala "raised money in an IPO, purposefully overestimated the future assets and business plan of the related IPO process. Then takes his investors' money by taking excessive profits."[24]  This statement is false and defamatory.  Mr. Bakala did not overestimate the future assets and business plan during the IPO process.  Mr. Bakala also did not take "excessive profits."  Defendants knew that these statements were false at the time they created the StopBakala.org website and at the time they

---

[22] *Miners Matter*, COALITION TO PROTECT OKD MINERS, https://www.stopbakala.org/ (last visited Aug. 20, 2018).
[23] *Id.*
[24] COALITION TO PROTECT OKD MINERS, https://www.stopbakala.org/ (last visited Aug. 20, 2018).

publicized that website, or Defendants made and publicized these statements in reckless disregard of the truth.

56.    Another page of the StopBakala.org website states that "[t]he European Commission is currently investigating hundreds of millions of Euro worth of illegal public aid during the Privatisation of the Mining Company OKD."[25]  This statement is false and defamatory.  In 2011, the European Commission determined that "the sale of 45.88% of OKD's shares to Karbon Invest…did not contain any elements of State aid within the meaning of Article 107 (1) TFEU."[26]  It is false that the European Commission is "currently investigating" this issue.  Defendants knew that these statements were false at the time they created the StopBakala.org website and at the time they publicized that website, or Defendants made and publicized these statements in reckless disregard of the truth.

57.    That same page of StopBakala.org states that "Karbon Invest bought a majority stake in OKD for considerably less than market value, shorting taxpayers by over half a billion dollars," and that "[t]he state's share in the company was sold for a price which was not created under market conditions, but rather though a skewed expert assessment."  This statement is false and defamatory.  In 2011, the European Commission concluded that Karbon Invest paid the Czech government market value for its minority shares in OKD:  "The Commission notes that all the indicators described below, despite their different methodologies, point towards a similar price range.  Indeed, all indicators individually and taken together, suggest that the sale price of CZK 4.1 billion was not below the market value of the 45.88% stake in OKD's shares."[27]  Moreover, about 4% of OKD's shares were publicly traded on the Prague Stock

---

[25]    *Illegal Public Aid*, COALITION TO PROTECT OKD MINERS, https://www.stopbakala.org/ (last visited Aug. 20, 2018).
[26]    Joaquin Almunia, *State aid No SA.25076 (2011/NN) – Czech Republic Privatisation of OKD a.s to Karbon Invest a.s.*, EUROPEAN COMMISSION (July 13, 2011), http://ec.europa.eu/competition/state_aid/cases/240829/240829_1235019_32_2.pdf.
[27]    *Id.* at 13.

Exchange and thus continuously valued by the market. The European Commission noted that "the sale price of the State's 45.88% shareholding in OKD was in line with the market price of the freely traded OKD shares in 2004."[28]  Further, in May 2018, a Czech court rejected charges that a valuation expert hired in 2004 had undervalued the shares that the Czech government had sold to Karbon Invest.[29]  Thus, Defendants knew that these statements were false at the time they created the StopBakala.org website and at the time they publicized that website, or Defendants made and publicized these statements in reckless disregard of the truth.

58.    The first page of StopBakala.org also includes a video containing additional false and defamatory statements.[30]  This video, which is identical (except for the voiceover, which is in English, rather than Czech) to the video on the Narodni Zajem Facebook page which has generated the bulk of the death threats against Mr. Bakala (*see* ¶¶ 30-31), again makes the false and defamatory allegation that Mr. Bakala "under very suspicious circumstances, purchased half of OKD from the state in 2004, Bakala promised according to the conditions stated in the sales contract he'd let the tenants buy the flats from him for the same price that he'd purchased them for himself."[31]  This is false and defamatory for the reasons stated above.

59.    The video, which has also been distributed by Krupa and Arca Capital directly to various recipients, additionally attacks the Blackstone Group. Blackstone—an American multinational private equity, alternative asset management and financial services firm—is an investor in the blocks containing the 43,000 apartment units in the Ostrava region. The video

---

[28]    *Id.* at 14.
[29]    Chris Johnstone, *Czech Court Clears Accused Over OKD Sale, Controversy Set to Continue*, Czech Radio (July 5, 2018), https://www.radio.cz/en/section/curraffrs/czech-court-clears-accused-over-okd-sale-controversy-set-to-continue.
[30]    Coalition to Protect OKD Miners, *Zdenek Bakala*, YouTube (June 28, 2018), https://www.youtube.com/watch?v=qUbM-FN5Nfc
[31]    *Id.* at 0:25.

states that Blackstone Group "investors, shareholders, and clients probably have no idea what the Group is doing with their money overseas.  They should get interested though, because the moment the court decides in favor of the miners from Ostrava, the compensation for damage will cost Blackstone considerable expenses."[32]  It also says the following:  "If you put money into a project that had been burdened with unethical, immoral, or illegal proceedings, you must be aware of the risk that it might get back to you eventually.  How long will parasites such as Blackstone, Citibank, or CBRE be capitalizing on the fraud of the century."[33]  Images of Mr. Bakala are shown in the video while the voiceover discusses "unethical, immoral, or illegal proceedings."[34] These statements are false and defamatory.

60.    The website also includes photographs of Mr. Bakala's house in Switzerland, where Mr. Bakala and his family, including his four elementary-school-age children, live during the school year.[35]  As discussed above, Krupa (or individuals working at the direction of Krupa) previously posted photographs of Mr. Bakala's Swiss house on online comment boards where other posters were explicitly making death threats against Mr. Bakala.

### *Crowds on Demand and Adam Swart Target Mr. Bakala's Business and Philanthropic Relationships*

61.    Throughout the summer of 2018 and continuing to the present, Defendants have sent countless emails containing links to the defamatory StopBakala.org website, as well as additional defamatory and harassing statements, to individuals and entities associated with Mr. Bakala's various business and philanthropic ventures.  This was done as part of a targeted campaign of extortion, harassment, defamation, and interference, in an effort to cause Mr. Bakala to pay Krupa and his associates the $23 million that Krupa demanded.

---

[32]  *Id.* at 1:53.
[33]  *Id.* at 2:21.
[34]  *Id.* at 2:23.
[35]  *Id.* at 1:12.

62.    *The Aspen Institute.*  On July 11, 2018, Swart contacted the General Counsel for The Aspen Institute.  Swart noted that Mr. Bakala served on The Aspen Institute board and stated "[w]e truly do insist that [Mr. Bakala] is removed expeditiously."  Swart stated:

> Mr. Bakala is currently under investigation by Czech authorities for misleading his investors, taking excessive profits from his company in a fraudulent manner, as well as his most reprehensible act of breaking a contract to sell housing units to working class miners for a reduced price.  The fact that he broke this contract with the miners has put thousands of miners out of their homes.  Believe me, being homeless in a Czech winter is something you wouldn't wish on your worst enemy.
>
> More information can be found on our website (StopBakala.org).

63.    As discussed above, Mr. Bakala did not, in fact, break a contract "with the miners that has put thousands of miners out of their homes."  Indeed, Mr. Bakala did not have any contract with any miners.

64.    The General Counsel for The Aspen Institute later spoke with Swart and asked for proof of these allegations.  Swart sent the General Counsel a document that was nearly identical to a document Krupa and Arca sent to Duff & Phelps and to the United Kingdom's Serious Fraud Office and Financial Conduct Authority, except that several paragraphs referencing Arca Capital (Krupa's company) had been removed.

65.    On June 26, 2018, an email containing nearly identical language was sent to the President and CEO of The Aspen Institute from someone named "Daniel Taylor" with the email address contact@stopbakala.org.  Daniel Taylor purported to be reaching out "on behalf of the Coalition to Protect OKD Miners."  Upon information and belief, Daniel Taylor is employed by Swart, Crowds on Demand, and/or Krupa.

66.    Crowds on Demand continued to bombard The Aspen Institute with emails. Between August 7-13, 2018, The Aspen Institute received numerous emails from Crowds on Demand using names such as "Gregory Jackson" and "Nedra Oppenheimer."

67.    On August 7, 2018, "Gregory Jackson" of Crowds on Demand threatened protests at the "front door" of The Aspen Institute if The Aspen Institute did not "do something."  "Jackson" continued: "We will be at your company next!"

68.    On August 9, 2018, a person associated with Crowds on Demand using the name "Rebecca Way" and the email address "rebecca@stopbakala.org" contacted another individual at The Aspen Institute stating that "[t]his past week, as you may be aware, there have been several protests staged around the country in support of the cause of the Ostrava-Karvina miners, with special attention paid to Zdenek Bakala and his role in depriving the OKD miners of their homes."  The email then appeared to threaten future protests, possibly at The Aspen Institute, unless The Aspen Institute engaged with StopBakala.org:

> More protests at more locations are planned for the upcoming weeks, including businesses on whose Boards Mr. Bakala sits.  Now might be an excellent time to schedule a phone conference with us here at the Coalition to Protect OKD Miners.  We look forward to opening a conversation that might lead to a resolution of the Ostrava Housing Crisis, and put an end to further protests.

69.    ***Blackstone Group and Round Hill Capital.***  As noted above, Blackstone Group and Round Hill Capital are investors in the apartment blocks in the Ostrava region.  In the past, Mr. Bakala and his businesses have had business relationships with Blackstone Group and Round Hill Capital.  For example, Mr. Bakala and his partners sold their equity interest in the company that owned the OKD apartment buildings to a company owned indirectly by Round Hill Capital and Blackstone.

70.    Krupa, Swart, and Crowds On Demand have orchestrated a campaign of many dozens of harassing emails to Blackstone and Round Hill Capital attacking Mr. Bakala, and threatening marches and bad publicity if the company does not "give back flats to miners."

71.    On July 2, 2018, someone using the name "Rebecca" sent a similar email "on behalf of the Coalition to Protect OKD Miners" to an individual at Blackstone Group and

provided a link to StopBakala.org.  "Rebecca" stated explicitly that Adam Swart was her "boss" and he was "leading our efforts."

72.     On July 4, 2018, Daniel Taylor sent an email to an individual at Round Hill Capital on behalf of "the Coalition to Protect OKD Miners" and asked to set up a call with Adam Swart, "our organization's director."

73.     On July 9, 2018, another individual using the name "Howard Insbruck" emailed Round Hill Capital stating that "Bakala promised to sell those housing units to the miners living in them at the same cost for which he'd purchased them—but instead, he raised the rents until he'd made them unaffordable for his employees, and then he sold them off to a third party."

74.     In July 2018, "Keith LaVoy," an individual believed to be employed by Swart, Crowds on Demand, and/or Krupa, emailed Round Hill and threatened protests at Blackstone and Round Hill: "Protests are likely to spring up next at Blackstone and Round Hill locations. Nothing you can't weather, I'm sure, but it's going to be some publicity, at the least."  In August 2018, "Lavoy" again threatened Round Hill and Blackstone with protests: "Protests of this treatment have begun to happen, and will likely come to Blackstone and Round Hill locations…"

75.     Also during this same period, "Myrna Norris," an individual believed to be employed by Swart, Crowds on Demand, and/or Krupa, emailed Round Hill and threatened protests at Blackstone and Round Hill: "You're going to need to make this right, and soon. More protests are planned.  The protests I mentioned were multi-day affairs, and both protesters and miners are looking to make a bigger scene, perhaps on your own doorsteps."

76.     ***Dartmouth College and Dartmouth's Tuck School of Business.***  In July 2018, the coordinated harassment campaign expanded to include Dartmouth College and Dartmouth's Tuck School of Business, where Mr. Bakala serves on the Board of Advisors.

77.     On July 5, 2018, Swart emailed the Dean of the Tuck School of Business at Dartmouth College, and requested a meeting to discuss Mr. Bakala.  Swart's assistant also left two voicemails on July 11 and another voicemail on July 18 trying to set up a meeting with the Dean.  A portion of Swart's July 5 email is below:

> I wanted to touch base with you to schedule a meeting with Dean ███████ in regards to Zdenek Bakala, a member of the Dartmouth Tuck School Board of Advisors. I'm also looping in ███████ considering this matter also pertains to Dean ███████ responsibilities.
>
> Mr. Bakala is currently under investigation by Czech authorities for misleading his investors, taking excessive profits from his company in a fraudulent manner, as well as his most reprehensible act of breaking a contract to sell housing units to working class miners for a reduced price. The fact that he broke this contract with the miners has put thousands of miners out of their homes. Believe me, being homeless in a Czech winter is something you wouldn't wish on your worst enemy.
>
> More information can be found on our website (StopBakala.org).
>
> Considering your mission of educating leaders with "empathy" and "humility"  it would seem ironic to have a Board of Advisors member who shows such lack of empathy (and integrity) by putting miners on the street and breaking a contractual obligation. Moreover, he lacks humility considering he has done this while living a lavish lifestyle complete with villas, rare cigars and vineyards while his victims have suffered.  We truly do insist that he is removed expeditiously.
>
> To that end, I think I should meet with Dean ███████ and Dean ███████ to present our case on Mr. Bakala in-depth and answer any questions they might have.

78.     Swart also emailed the Dartmouth President's office on July 16 (with Daniel Taylor copied) in attempt to set up a meeting.  In that July 16, 2018 email, Swart states:

> Mr. Bakala is currently under investigation by Czech authorities for misleading his investors, taking excessive profits from his company in a fraudulent manner, as well as his most reprehensible act of breaking a contract to sell housing units to working class miners for a reduced price. The fact that he broke this contract with the miners has put thousands of miners out of their homes. Believe me, being homeless in a Czech winter is something you wouldn't wish on your worst enemy.
>
> More information can be found on our website (StopBakala.org).
>
> Considering that the Tuck School is charged with the mission of educating leaders with "empathy" and "humility"  it would seem ironic to have a Board of Advisors member who shows such lack of empathy (and integrity) by putting miners on the street and breaking a contractual obligation. Moreover, he lacks humility considering he has done this while living a lavish lifestyle complete with villas, rare cigars and vineyards while his victims have suffered.  We truly do insist that he is removed expeditiously from the board.

79.     Swart, Krupa, and Crowds on Demand also caused other emails regarding Mr. Bakala to be sent to individuals at Dartmouth.  For instance, on July 5, 2018, a person associated with Crowds on Demand, using the name Erik Jones, emailed the Dean of the Tuck School of Business at Dartmouth College, from a Gmail account.  "Jones" demanded that Dartmouth remove Mr. Bakala from its board and stated, "You have a criminal on your beard [sic] that is on the verge of paying for his actions. Is this something that you want in your company and on your board?"

80.     On August 28, 2018, someone using the name "Rebecca Walker" emailed the executive assistant to the Dean of the Tuck School of Business.  This came from the same email address—rebecca@stopbakala.org—that was previously used to email The Aspen Institute, except that in that instance the name "Rebecca Way" was used.  This August 28, 2018 email falsely states that "Mr. Bakala is facing civil litigation and criminal investigation in the Czech Republic, the United States, Switzerland, Poland, and the United Kingdom."

81.     Similarly, Swart, Krupa, and Crowds on Demand caused a flood of emails to be sent to a professor at Dartmouth's Tuck School of Business in August 2018.  These emails defame Mr. Bakala and threaten protests at Dartmouth if the institution does not cut ties with Mr. Bakala.  For example, an August 13, 2018 email from someone using the name "Oscar Feria" states that "Mr. Bakala…failed to honor a contract to keep miners in their homes" and states that "[t]o avoid protestors at your door, perhaps it might be best to consider his association with your board…"  Another example is an email from someone using the name "Michael Bradford" that was sent to the same professor  on August 13, 2018.  This email repeats the defamatory allegation that "[t]he lie [Mr. Bakala] told put thousands of hardworking people out of their homes."

82.     Another email to Dartmouth stated, "Good Afternoon, Zdenek Bakala is on your Board, and he [sic] will bring protests to your front door if you do not do something. … Miners have already started protesting in New York City, Buffalo, and Omaha. We will be at your company next!"

83.     Officials at Dartmouth received many similar emails from other persons using Gmail accounts, as well as hundreds of telephone calls from persons affiliated with Crowds on Demand, maligning Mr. Bakala, demanding to meet with Dartmouth's leadership, and vowing not to stop unless and until such a meeting is granted.

84.     One individual left a voice message for an official at Dartmouth on behalf of StopBakala.org, the website created by Krupa, Swart, and Crowds on Demand.  The caller threatened protests at Dartmouth in a voice message: "We're probably going to be coming to the school to come and talk to you in person. So, please reach back out over the phone that way we can just avoid coming to the school and having you know, maybe a group of people standing outside chanting on behalf of this criminal that we're after. So, give us a call and we can go ahead and resolve it."

85.     As a result of unrelenting phone calls, Dartmouth blocked the phone number of a Crowds on Demand caller on July 11, 2018, but the Crowds on Demand associate called from a new number, stated that she knew her number had been blocked, and pledged that "she and hundreds of others will call … from as many different numbers as possible until they get what they want."  These repeated telephone calls continued.  For example, on August 28, 2018 at 2:53 p.m.,  the executive assistant to the Dean of the Tuck School of Business received a telephone call from someone purporting to be calling on behalf of the OKD miners.  The assistant asked him not to call again.  But she received another call from the same number at 3:47 p.m. on August 28, 2018, and another call from the same number at 3:54 p.m.  Dartmouth

has been forced to try to block the telephone numbers of repeat-callers, but has been largely

unsuccessful, due to the volume of harassing, unwanted telephone calls.

86.    To date, Dartmouth has received well over 100 emails and over 750 phone calls

from Swart and Crowds on Demand.

87.    ***Berkshire Hathaway.***    In August 2018, the harassment campaign expanded

further to include protests at the offices of Berkshire Hathaway in Omaha, Nebraska.  Berkshire

Hathaway owns a small portion of M&T Bank, whose subsidiary Wilmington Trust, in turn,

acts as security agent for the bonds issued by Residomo s.r.o, which owns the Ostrava

apartment buildings.  On August 1, 2018, a group hired by Crowds on Demand and led by

Crowds on Demand's Daniel Taylor, posed as the Coalition to Protect OKD Miners.

Purporting to be an Omaha organization, the group protested outside of Berkshire Hathaway's

Omaha offices.[36]  An Omaha television station covering the protest characterized it as a protest

by "Omaha citizens."[37]  According to the television station, the Coalition to  Protect OKD

Miners said that "a European business bought OKD Mining for a fraction of its value" and

"because of this coal miners were impacted and it left thousands of people homeless."[38]  The

"protestors" carried signs directing people to the "StopBakala.org" website.

88.    Upon information and belief, these protestors are paid actors hired by Crowds

on Demand, Swart, and Krupa to harass Mr. Bakala and interfere with his potential business

relationships with Berkshire Hathaway and others, in order to pressure him to pay Krupa's

extortion demand. Indeed, Daniel Taylor of Crowds on Demand appeared at the

---

[36]    *Omaha citizens protest to advocate for Czech miners*, WOWT (Aug. 2, 2018),
http://www.wowt.com/content/news/Omaha-citizens-protest-to-advocate-for-Czech-miners-489838341.html.
[37]    *Id.*
[38]    *Id.*

"demonstration" in Omaha, Nebraska, describing himself as the organizer of the Coalition to Protect OKD Miners.[39]



89.    Daniel Taylor apparently travels the country for Swart directing paid "protests." For example, the news article exposing Crowds on Demand's involvement in an October 2017 power-plant hearing in New Orleans, described above, identified Daniel Taylor as the recruiter of paid actors to speak at the proceeding.[40]

---

[39]    *Id.*
[40]    Michael Issac Stein, *Actors were paid to support Entergy's power plant at New Orleans City Council meetings*, THE LENS (May 4, 2018), https://thelensnola.org/2018/05/04/actors-were-paid-to-support-entergys-power-plant-at-new-orleans-city-council-meetings/



"*Behind a sea of orange shirts at the October meeting stood two men who had recruited people to support and speak on behalf of the power plant: Garrett Wilkerson, left, and Daniel Taylor, right. The Lens obtained messages from Wilkerson outlining how much people would be paid, what to do and say at the meeting, and to stay quiet about the arrangement.*"

90.    Krupa has sought to leverage the Omaha "demonstration" by posting a link to a media report about the demonstration on his Czech Facebook page.  Pretending that it was news to him, Krupa wrote (translated): "An American Coalition for defense of OKD miners has held in the USA several protests against Zdenek Bakala. They want him to take responsibility for the so-called 'fraud of the century' as explained by a representative of the Coalition. Interesting report."



91.     *North-Line.*  Mr. Bakala is in the process of selling one of his companies, North-Line a.s., for a substantial sum.  North-Line a.s. owns a commercial property, the Forum Karlin, in Prague, Czech Republic.  On July 19, 2018, Adam Swart contacted the purchaser in an attempt to smear Mr. Bakala.  In that email, Swart provided a link to the false and defamatory StopBakala.org website; made additional false and defamatory statements; and explicitly suggested that the purchaser should withdraw from this acquisition, falsely asserting that the purchaser may face liability if it purchases the Forum Karlin property.  An excerpt from a translated version of this email (originally in French, as the potential purchaser is a French entity) is below:

"Dear ▮▮▮▮

I hope you enjoyed a pleasant week and had an excellent holiday for the 14th of July!

I represent the Coalition for the Protection of Minors OKD ([www.StopBakala.org](www.StopBakala.org)) and I am writing to you to organize a meeting with the concerned ▮▮▮ executives. The purpose of the meeting is to discuss ▮▮▮ potential purchase of the Forum Karlin property in Prague. More precisely, ▮▮▮ buys it from the controversial Czech billionaire, Zdenek Bakala

We respectfully recommend that you withdraw from this acquisition for the following reasons.

1. Mr. Bakala is currently under investigation by the Czech authorities for misleading his investors by making excessive profits from his company in a fraudulent manner. It illustrates that he is a dishonest criminal.
2. Mr. Bakala previously broke his contract to sell housing to working-class miners in Ostrava for a reduced price. The fact that he broke that contract with the miners put thousands of miners out of their homes. Believe me, being homeless in a Czech winter is something you wouldn't wish on your worst enemy. He is clearly an unethical and dishonorable man.
3. Mr. Bakala is currently being prosecuted in Czech courts by miners because of the contract he violated. If he loses, he'll owe the miners a lot of money. This judgment would likely require the sale of the Karlin Forum property for the purpose of paying the parties
4. Mr. Bakala's attempt to sell this property is a deliberate attempt to extract his funds to escape a probable judgment against him in Czech courts.
5. ▮▮▮ may be liable for these liabilities in the event that you have purchased the Forum Karlin property.

Based on these concerns, I would like to meet with you to discuss this issue in more detail.

I am available to meet with you at your convenience as soon as possible.

You can reach me at tel: +16503530083 or at [Adam@Swart.org](Adam@Swart.org)

Please accept, Sir, the assurance of my highest consideration. Please let me know what you recommend.

Sincerely,

Adam Swart
Coalition to Protect OKD Miners

--
Adam R. Swart
Email: [adam@swart.org](adam@swart.org)
Cell: 650-353-0083"

92.     Crowds on Demand and Adam Swart's actions have damaged Mr. Bakala's business relationships with the purchaser. Defendants are attempting to derail the as-yet uncompleted North-Line transaction.  At a minimum, Swart's and Crowds on Demand's interference has weakened Mr. Bakala's negotiating position with the purchaser and may result in Mr. Bakala being required to provide additional representations or warranties.  Further, Defendants' actions may make the purchaser less likely to do business with Mr. Bakala in the future.

93.     ***The Design Museum.***  The Design Museum is a not-for-profit art institute located in London and showcases aspects of design from fashion to architecture to industrial design.  Mr. Bakala has served as a board member of The Design Museum since 2013.  Swart and Crowds on Demand have made (to date) over 140 telephone calls to The Design Museum to defame and harass Mr. Bakala and to damage his relationship with The Design Museum. Swart and Crowds on Demand used the same telephone number to call The Design Museum that they used to contact Dartmouth College.

94.     ***The Dox Centre for Contemporary Art.***  The Dox Centre for Contemporary Art is an art institute in the Czech Republic.  Mr. Bakala is a partner of the Dox Centre.  Swart and Crowds on Demand have made (to date) hundreds of calls to the Dox Centre using the same telephone number that they used to contact Dartmouth College and The Design Museum. These calls were also made to defame and harass Mr. Bakala and to damage his relationship with the Dox Centre.

95.     The Aspen Institute officers and Dartmouth College administrators are all United States citizens residing and working in the United States.  Krupa, Swart, and Crowds on Demand targeted The Aspen Institute, Dartmouth College, Blackstone Group, Round Hill Capital, Berkshire Hathaway, the North-Line purchaser, The Design Museum, and the Dox

Centre because they knew Mr. Bakala either served on their Boards or had in some cases actual or potential business relationships with them.

***Crowds on Demand and Adam Swart Target Mr. Bakala's Home in Hilton Head***

96.    On August 8-9, 2018, Defendants escalated the harassment campaign again. This time, twelve "protestors" purportedly affiliated with the Coalition to Protect OKD Miners (who upon information and belief were individuals paid by Defendants) converged at Hilton Head Plantation, Hilton Head Island, South Carolina.  Mr. Bakala owns a home there, and the "protestors" carried signs stating "Scammer of the Decade Lives Here."   Other "protestors" carried signs showing pictures of Mr. Bakala above the word "Scam" and "Fraud," as well as signs directing people to the defamatory "StopBakala.org" website.



97.    A press release distributed by the Coalition to Protect OKD Miners said it had "launched protests at the Hilton Head, SC estate of Zdenek Bakala" and protestors "dressed as coal miners, descended on Bakala's estate to demand Bakala make amends for his past alleged wrongdoings."[41]

---

[41]   *Coalition to Protect OKD Miners Protests Zdenek Bakala's Hilton Head Estate*, ACN Newswire (Aug. 8, 2018), http://www.acnnewswire.com/press-release/english/45312/.

98.    Paid protesters marched with signs in the streets by the Skull Creek Boathouse and by Chaplin Community Park in Hilton Head, South Carolina, and chanted, "Bakala is a creep! He'll steal your home while you sleep!"[42]



99.    Paid protesters also stood outside the Hilton Head Plantation, a gated community, and chanted, "Bakala's a piece of s**t! He takes your home and then he splits!"[43] The Coalition to Protect OKD Miners published a video on YouTube with a caption, "Protests

---

[42]    Coalition to Protect OKD Miners, *"The Bakala Stomp" is the best dance you will ever see*, YOUTUBE (Aug. 9, 2018), https://www.youtube.com/watch?v=zh0PMeIQq_M; Coalition to Protect OKD Miners, *New dance craze: "The Bakala Stomp"*, YOUTUBE (Aug. 9, 2018), https://www.youtube.com/watch?v=6EtUsprKFuc&index=6&list=UUcsd9CJs-3E21Qs0rBUs6qg; Coalition to Protect OKD Miners, *Nice park you have there. Be a shame if somebody... called your town out for harboring a fugitive*, YOUTUBE (Aug. 9, 2018), https://www.youtube.com/watch?v=UDqbfI6mWA8&list=UUcsd9CJs-3E21Qs0rBUs6qg.

[43]    Coalition to Protect OKD Miners, *Protests outside Bakala's favorite plantation*, YOUTUBE (Aug. 9, 2018), https://www.youtube.com/watch?v=2rp97agwL18; Coalition to Protect OKD Miners, *Bakala is full of shit, he takes your house and then he splits*, YOUTUBE (Aug. 8, 2018), https://www.youtube.com/watch?v=gFli2GcTPX0&list=UUcsd9CJs-3E21Qs0rBUs6qg&index=9 (commenting "Spreading the truth at Bakala's summer home in South Carolina"); Coalition to Protect OKD Miners, *Visiting Bakala's Summer Home in Hilton Head, South Carolina*, YOUTUBE (Aug. 8, 2018), https://www.youtube.com/watch?v=ZAz8C8BKXHk.

outside Bakala's favorite plantation," and wrote, "Sources say he likes to come here and pretend he owns people. He's scum."[44]  Similarly, paid protesters stood outside the Main Street Village in Hilton Head and yelled, "Bakala, Bakala, we know what you did! Lied! Cheated! Stolen! Hid!"[45] Another one of these paid protestors confronted a security guard outside a gated community in Hilton Head and stated, "There's a resident here who's committed numerous crimes in Europe and basically fled to America…"[46]

100.    The August 8-9, 2018 protests in Hilton Head, South Carolina show that Defendants' campaign of extortion, interference, and defamation is escalating and likely will continue to do so.

## FIRST CAUSE OF ACTION
### (RICO Section 1962(c))

101.    All of the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

102.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

103.    Mr. Bakala is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

104.    Krupa, Swart, and Crowds on Demand (the "RICO Defendants") are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

---

[44]   Coalition to Protect OKD Miners, *Protests outside Bakala's favorite plantation*, YOUTUBE (Aug. 9, 2018), https://www.youtube.com/watch?v=2rp97agwL18.

[45]   Coalition to Protect OKD Miners, *Outside Bakala's favorite restaurants and shops*, YOUTUBE (Aug. 9, 2018), https://www.youtube.com/watch?v=_r6wMq5KU44.

[46]   Coalition to Protect OKD Miners, *Politely letting the gated community guard know they're harboring a European fugitive :)*, YOUTUBE (Aug. 9, 2018), https://www.youtube.com/watch?v=0Hh3Lukvqu8.

105.    Arca Capital and Krupa Global Investments constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Arca/Krupa Global Enterprise"). The Arca/Krupa Global Enterprise is directed by Krupa who financed, developed, and implemented the RICO Fraud/Extortion Scheme.

106.    In violation of 18 U.S.C. § 1962(c) Krupa, Swart, and Crowds on Demand conducted and/or participated in the conduct of the Arca/Krupa Global Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity attempting to unlawfully seize control of properties and extort payments from numerous victims ("the RICO Fraud/Extortion Scheme"), including but not limited to: Mr. Bakala, Blackstone, and Round Hill.

107.    Krupa, Swart, and Crowds on Demand participated in the operation or management of the Arca/Krupa Global Enterprise by, among other things, providing instruction, material support and financing to implement the RICO Extortion/Fraud Scheme. Krupa, Swart, and Crowds on Demand also solicited and hired agents to assist in and fulfill necessary roles in the implementation of the RICO Fraud/Extortion Scheme, including but not limited to, paid actors and fake protestors.

108.    The common purpose of the members and agents of the Arca/Krupa Global Enterprise was to extort money and/or property from Mr. Bakala and other victims and profit thereby. Krupa, Swart, and Crowds on Demand have engaged in racketeering and other activities affecting interstate commerce since at least April 2017.

109.    The pattern of racketeering activity consisted of Krupa, Swart, and Crowds on Demand committing, directing, and aiding and abetting the commission of numerous acts of racketeering activity including extortion, wire fraud, and interstate and foreign travel in aid of racketeering enterprises, in violation of 18 U.S.C. §§ 1343, 1951, 1952, and 1961(1).

110.    In violation of 18 U.S.C. § 1961 (1), Krupa, Swart, and Crowds on Demand engaged in "racketeering activity" including extortion as chargeable under South Carolina State

law which is punishable by imprisonment for more than one year. Specifically, S.C. Code Ann.

§ 16-17-640 provides that:

> Any person who verbally or by printing or writing or by electronic communications:
>
> (1) accuses another of a crime or offense;
>
> (2) exposes or publishes any of another's personal or business acts, infirmities, or
> failings; or
>
> (3) compels any person to do any act, or to refrain from doing any lawful act, against
> his will;
>
> with intent to extort money or any other thing of value from any person, or attempts
> or threatens to do any of such acts, with the intent to extort money or any other thing
> of value, shall be guilty of blackmail and, upon conviction, shall be fined not more
> than five thousand dollars or imprisoned for not more than ten years, or both, in the
> discretion of the court.

111.    As set forth above, in violation of S.C. Code Ann. § 16-17-640, Krupa, Swart,

and Crowds on Demand repeatedly threatened and subsequently implemented a false

harassment campaign accusing Mr. Bakala of criminal offenses, unethical conduct, and

business misdeeds, in numerous verbal, written and electronic communications, with the intent

to extort money from Mr. Bakala.

112.    Likewise, in violation of 18 U.S.C. § 1951 Krupa, Swart, and Crowds on

Demand attempted to obstruct, delay, or affect commerce through the wrongful use of

extortion, threats and demands, which caused Mr. Bakala to fear for his personal and economic

well-being as well as the safety of his family. Specifically, Krupa, Swart, and Crowds on

Demand engaged in a continuing extortionate scheme using threats of physical, reputational,

and economic harm if Mr. Bakala did not meet their payment demands. Mr. Bakala's refusal

to meet the extortion demand resulted in the RICO Defendants' organizing and financing a

widespread harassment campaign against Mr. Bakala in the United States engaging "crowds-

for-hire" to create a façade of negative public opinion targeting organizations Mr. Bakala

supports, serves, and conducts business with. The purpose of this fake campaign is to harm and instill fear in Mr. Bakala so that he will pay the extortion demand.

113.    In violation of 18 U.S.C. § 1343, Krupa, Swart, and Crowds on Demand engaged in a scheme or artifice to defraud Mr. Bakala and his business and philanthropic contacts in order to obtain money or property from Bakala by means of false or fraudulent pretenses and representations. Specifically, as noted above, Krupa demanded that Mr. Bakala pay him 500 million crowns (approximately $23 million) in exchange for ceasing the harassment campaign against him. When Mr. Bakala refused to meet this demand, Krupa employed a scheme or artifice to defraud Mr. Bakala's business contacts to induce them to sever business ties with him through numerous false representations as noted above.

114.    In furtherance of this scheme or artifice, Krupa, Swart, and Crowds on Demand transmitted or caused to be transmitted numerous emails and telephone calls by means of wire communication in interstate commerce, including but not limited to the following writings:

   a.    On July 5, 2018, Swart emailed the office of the Dean of the Tuck School of Business at Dartmouth College in an attempt to damage Mr. Bakala's reputation and destroy his relationship with the school.

   b.    On July 19, 2018, Swart contacted the potential purchaser of North-Line in an attempt to smear Mr. Bakala and disrupt a pending real estate transaction.

   c.    On July 11, 2018, Swart sent an email to the General Counsel for The Aspen Institute, insisting that Mr. Bakala be expeditiously removed from the organization.

   d.    On July 16, 2018 Swart emailed the Dartmouth President's office in an attempt to damage Mr. Bakala's reputation and destroy his relationship with the school.

e.      On August 28, 2018, an individual using the email address—rebecca@stopbakala.org— sent an email to the executive assistant to the Dean of the Tuck School of Business falsely claiming that "Mr. Bakala is facing civil litigation and criminal investigation in the Czech Republic, the United States, Switzerland, Poland, and the United Kingdom." The executive assistant also received harassing phone calls at 3:47 p.m. and 3:54 p.m. on August 28, 2018.

f.      On August 9, 2018, an individual using the email address—rebecca@stopbakala.org—threatened future protests, possibly at The Aspen Institute, unless The Aspen Institute engaged with StopBakala.org.

g.      On August 13, 2018, "Oscar Feria" sent an email to a professor at Dartmouth's Tuck School of Business threatening that "[t]o avoid protestors at your door, perhaps it might be best to consider his association with your board…"

115.    The common purpose of each of these wire transmissions was to further the RICO Extortion/Fraud Scheme by making misrepresentations to Mr. Bakala's business contacts in an effort to defraud them and economically injure Mr. Bakala.

116.    In violation of 18 U.S.C. § 1952(a), the RICO Defendants traveled in interstate and/or foreign commerce and/or used facilities in interstate and foreign commerce (including but not limited to wire, telephone and internet communications), with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activities including extortion in violation of both state and federal law, including but not limited to:

a.  On July 5, 2018, Swart emailed the Dean of the Tuck School of Business at Dartmouth College in an attempt to damage Mr. Bakala's reputation and destroy his relationship with the school.

b.  On July 19, 2018, Swart contacted the potential purchaser of North-Line in an attempt to smear Mr. Bakala and disrupt a pending real estate transaction.

c.  On July 11, 2018, Swart sent an email to the General Counsel for The Aspen Institute insisting that Mr. Bakala be expeditiously removed from the organization.

d.  On July 16, 2018, Swart emailed the Dartmouth President's office in an attempt to damage Mr. Bakala's reputation and destroy his relationship with the school.

117.  The acts of racketeering activity referred to in the previous paragraphs constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The criminal racketeering activity described above employs a common, ongoing course of conduct intended to pressure Mr. Bakala and other victims into paying money in exchange for ending a harassment campaign against them.  The racketeering activity is related, having (1) common participants, (2) the same victims, and (3) the same purpose and result of benefiting the RICO Defendants or co-conspirators at the expense of Mr. Bakala.  The predicate acts constituting a pattern of racketeering activity also are interrelated, as each of the foregoing acts can be traced to a coordinated harassment campaign against Mr. Bakala.  A specific threat of repetition exists, in that the RICO Defendants have promised to escalate their harassment campaign while demanding millions of dollars to end the harassment campaign.  In addition, the RICO Defendants' use of a similar pattern of racketeering activity against other victims suggests a threat of continuing racketeering activity against both Mr. Bakala and future victims.

118.    In conducting the pattern of racketeering activity as set forth above, the RICO Defendants regularly exchanged communications across state and foreign borders, and therefore were engaged in and affected interstate and foreign commerce.  In furtherance of the extortionate scheme, members of the enterprise have made payments to one another, and in doing so, passed money through the United States' banking system.  Additionally, demands made by members of the enterprise necessarily intended that, as both purpose and effect, funds would be transferred to or from South Carolina across state and foreign borders as part of their extortionate scheme.

119.    As a direct and proximate result of the RICO Defendants' conduct and participation in the enterprises' racketeering activity, including its predicate acts, Mr. Bakala has been injured by reason of the violations of 18 U.S.C. § 1962(c).  The RICO Defendants' violations of 18 U.S.C. § 1962(c), have caused economic injuries to Mr. Bakala's business, property, and reputation, as well as other injuries and damages to be proven at trial.  Further, Defendants' racketeering activity continues, as do Mr. Bakala's injuries.

120.    By virtue of these violations of 18 U.S.C. § 1962(c) and pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Mr. Bakala for actual damages, treble damages, the cost of this suit, and reasonable attorneys' fees.  Additionally, pursuant to 18 U.S.C. § 1964(a), Mr. Bakala is entitled to an order that Defendants cease their extortionate activity by ending their coordinated harassment campaign against Mr. Bakala.

## SECOND CAUSE OF ACTION
### (RICO Section 1962(d))

121.    All of the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

122.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

123.    Defendants agreed and conspired to participate in, or to facilitate the commission of, predicate acts as stated above, and agreed and conspired to facilitate the acts leading to the substantive offense of conducting the affairs of the enterprise through a pattern of racketeering activity, which included the repeated acts alleged above, in violation of 18 U.S.C. § 1962(d).

124.    The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) enterprise described previously through a pattern of racketeering activity.

125.    As demonstrated in detail above, Defendants have engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy, including material misrepresentations, wire fraud and extortion designed to deprive Mr. Bakala of his money and/or property.

126.    The nature of the above-described RICO Fraud/Extortion scheme gives rise to an inference that the members of the enterprise not only agreed to the objective of a RICO conspiracy under 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing extortionate acts have been and are part of an overall pattern of racketeering activity.

127.    As a direct and proximate result of Defendants' conspiracy to participate in the conduct of the affairs of the enterprise alleged herein, Mr. Bakala has been and continues to be injured in his property and person, as set forth above.

128.    By virtue of these violations of 18 U.S.C. § 1962(d), and pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Mr. Bakala for actual damages, treble damages, the cost of this suit, and reasonable attorneys' fees.  Further, pursuant to 18 U.S.C. § 1964(a), Mr. Bakala is entitled to an order that Defendants cease their extortionate activity by ending their coordinated harassment campaign against Mr. Bakala.

## THIRD CAUSE OF ACTION
### (Defamation)

129.     All of the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

130.     Defendants have made numerous false and defamatory statements concerning Mr. Bakala.  As discussed in more detail above, these false and defamatory statements include the emails Swart and Crowds on Demand sent (at Krupa's direction) to The Aspen Institute, Dartmouth College, Blackstone Group, Round Hill Capital, the potential purchaser of North-Line, The Design Museum, and the Dox Centre.  Krupa, Swart, and Crowds on Demand also made numerous false and defamatory statements about Mr. Bakala on the StopBakala.org website.  Further, paid agents of the defendants congregating outside of Mr. Bakala's property in Hilton Head, South Carolina, and in other locations carried signs directing observers to the StopBakala.org website.

131.     These false and defamatory statements were published to third parties, including individuals at The Aspen Institute; Dartmouth College; Blackstone Group; Round Hill Capital; the potential purchaser of North-Line; The Design Museum; the Dox Centre; visitors and residents at Hilton Head, South Carolina; and the general public via the StopBakala.org website.

132.     The emails and website referred to Mr. Bakala by name, the website included his picture, and the statements were understood by those who read them to be about and concerning Mr. Bakala.

133.     The false and defamatory statements are defamatory on their face.  Defendants made false statements alleging that Mr. Bakala committed misconduct in the course of his trade, profession, or occupation.  Defendants also falsely stated that Mr. Bakala engaged in criminal conduct of moral turpitude.

134.    Moreover, Mr. Bakala suffered damages due to Defendants' defamatory statements.

135.    The publications of these false and defamatory statements were not privileged.

136.    Krupa, Swart, and Crowds on Demand knew that each of the defamatory statements were false at the time they made them, or else Defendants made the statements with reckless disregard of whether they were false or not.

### FOURTH CAUSE OF ACTION
#### (Tortious Interference)

137.    All of the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

138.    Defendants intentionally interfered with Plaintiff's potential contractual relations.  For example, Defendants intentionally contacted numerous individuals at The Aspen Institute, Dartmouth College, The Design Museum, and the Dox Centre, four institutions with which Mr. Bakala is affiliated, and demanded that he be immediately removed from each respective Board.  Further, Defendants intentionally contacted the potential buyer of North-Line in an attempt to interfere with the transaction.  The StopBakala.org website also warned investors in Citibank, Blackstone, and CBRE about potential negative consequences of doing business with Mr. Bakala.

139.    Defendants contacted The Aspen Institute, Dartmouth College, the North-Line purchaser, The Design Museum, and the Dox Centre with the sole purpose of harming Mr. Bakala, and did so using improper methods and means.

140.    Defendants' conduct has caused injury to Mr. Bakala's business relationships.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Bakala respectfully requests that this Court grant him the

following relief:

a. Actual damages in excess of $75,000, together with compensatory, consequential, treble, and punitive damages, with pre-judgment and post-judgment interest thereon at the highest rate allowed by law;

b. A preliminary and permanent injunction preventing Defendants from continuing their orchestrated harassment campaign against Mr. Bakala;

c. Attorneys' fees and costs of court as allowed by law; and,

d. All other relief, legal or equitable, to which Mr. Bakala shows himself entitled.

Respectfully submitted,

*s/ Marshall Winn*

Marshall Winn (D.S.C. Bar No. 529)
Wallace K. Lightsey (D.S.C. Bar No. 1037)
WYCHE, P.A.
Post Office Box 728
Greenville, SC  29602-0728
Telephone: (864) 242-8200
E-mail:    mwinn@wyche.com
               wlightsey@wyche.com

*Of Counsel:*

Andrew Schapiro (*Pro Hac Vice*)
Stephen Swedlow (*Pro Hac Vice*)
Margaret Haas (*Pro Hac Vice*)
QUINN EMANUEL URQHART & SULLIVAN, LLP
191 North Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
E-Mail:    andrewschapiro@quinnemanuel.com
               stephenswedlow@quinnemanuel.com
               margarethaas@quinnemanuel.com

Date: October 11, 2018                    ***ATTORNEYS FOR PLAINTIFF***