# Exhibit A

LA COTE DISTRICT COURT                                                            July 14, 2017

# LAWSUIT SEEKING DAMAGES
# FOR TORTS

(Art. 41 and thereafter of the Code of Obligations)

SIMPLIFIED PROCEDURE

(Litigious value: CHF 17,221.70)

for

**Zdenek Bakala**, residing at ███████████████████

but who for the present case elects domicile at the Law Firm of BianchiSchwald Sàrl (Société à responsabilité limitée [LLC]), 5, rue Jacques-Balmat, Case postale 5839, 1211 Geneva 11 and represented by <u>Jean-Marc Carnicé, Esq. and Philippe Neyroud, Esq. (Exhibit 0)</u>

**Plaintiff**

versus

**Pavol Krupa**, residing at ███████████████████████

**Defendant**

I.       **SUBMISSIONS**

Zdenek Bakala has the honor of submitting the following

**MAY IT PLEASE THE DISTRICT COURT OF LA COTE**

*In advance*

- Declare the present request to be admissible;
- Observe that the plaintiff has waived recourse to the conciliation procedure;

*Mainly*

- Order Pavol Krupa to pay the sum of CHF 17,221.70 to Zdenek Bakala, with interest of 5% per year starting on April 10, 2017, as damages and interest;
- Also order payment of fees and expenses.


II.      **SUBJECT OF THE DISPUTE**

The defendant launched virulent attacks against the plaintiff, inciting the public to attack the defendant's person and property in Nyon, notably by posting videos on the Internet. In particular, he organized a public protest that was to be held outside the defendant's residence, inviting unemployed miners and supporters of the Banik Ostrava soccer club who are known for their hooliganism, to travel to Nyon, stating that even if local administrative authorities did not issue a permit, he would continue with the protest nonetheless.

This hate-filled incitements to commit acts of violence were broadcast by taking of advantage of the resentment felt by laid-off miners following the collapse of the largest mining complex in the Czech Republic, by erroneously saying that this collapse was the fault of the plaintiff, who was involved in its restructuring.

The aim of the present request is to obtain reparation for the damage directly related to the security measures required by these calls to violence.


III.     **FACTS**

1. **The Plaintiff**

    1. The plaintiff is an entrepreneur and investor of Czech origin.

        Exhibit 1: Excerpt from the website http://www.fondation-zmb/ch/fr/our-founders

    2. In 1981, he emigrated from Czechoslovakia to the United States at the age of 19.

        Exhibit 1: Excerpt from the website http://www.fondation-zmb/ch/fr/our-founders

    3. After learning English, he was accepted to the University of California, Berkeley, and then he got an MBA from Dartmouth College in New Hampshire

        Exhibit 1: Excerpt from the website http://www.fondation-zmb/ch/fr/our-founders

    4. He then worked as a banker in New York City with Drexel Burnham Lambert and Bank of America, before moving to London to start a job with Credit Suisse First Boston.

        Exhibit 1: Excerpt from the website http://www.fondation-zmb/ch/fr/our-founders

    5. Following the Velvet Revolution in 1989 in Czechoslovakia, he returned to Prague in order to set up Credit Suisse's first office there.

        Exhibit 1: Excerpt from the website http://www.fondation-zmb/ch/fr/our-founders

    6. In 2004, the plaintiff and several partners acquired the company Karbon Invest in the Czech Republic. This company is the owner of OKD, the country's largest coal power and coking company.

        Exhibit 1: Excerpt from the website http://www.fondation-zmb/ch/fr/our-founders

    7. The plaintiff moved to Switzerland in 2009, and since that time has lived in Nyon with his wife and four children, ages 11, 8, 9 and 3.

        Exhibit 2: Certificate of residence

        Evidence: Examination or deposition of the parties

2. **The Defendant**

    8. The defendant is a Slovakian entrepreneur residing in Slovakia.

        Evidence: Examination or even deposition of the parties

    9. He is the founder and chairman of the board of Arca Capital.

        Exhibit 3: Excerpt from the website http://www.arcacapital.com/en/arca-capital/team and free translation thereof

    10. He has never had a personal or professional relationship with the plaintiff in the past. He has never been involved in companies controlled by the plaintiff.

        Evidence: Examination or deposition of the parties

11. However, he is currently minority shareholder in the company New World Resources plc ("NWR"), which is currently in bankruptcy proceedings, and in which the plaintiff formerly owned a minority shareholding.

   Evidence: Examination or deposition of the parties

### 3. Current context

12. During the past few years, the plaintiff has been the object of repeated attacks from the current Czech government, in particular from President Zeman and the Minister of Finance, Mr. Andrej Babis.

   Exhibit 4: Article published on August 2, 2015 in HRAD.CZ and free translation thereof

   Exhibit 5: Article published on January 17, 2016 in BLESK.CZ and free translation thereof

   Exhibit 6: Article published on February 25, 2016 in BLESK.CZ and free translation thereof

13. The plaintiff supports the other side of the political spectrum.

   Evidence: Examination or deposition of the parties

14. He was close to Mr. Vaclav Havel and the men who took part in the Velvet Revolution and in the transition to democracy in the Czech Republic.

   Evidence: Examination or deposition of the parties

15. He also supported Mr. Karel Schwarzenberg, opponent of the current party in power, when he was a presidential candidate in 2013, running against the current President, Mr. Milos Zeman.

   Evidence: Examination or deposition of the parties

16. The broadcasting of attacks by his detractors is made all the easier because the company controlled by the Minister of Finance, Mr. Andrej Babis, is the owner of the publisher of the two largest daily newspapers in the country.

   Exhibit 7: Article in Politico on October 29, 2015 and free translation thereof

   Exhibit 8: Excerpts from the Trade Register for Agrofert and MAFRA and free translations thereof

17. These attacks concern, firstly, the bankruptcy of the company OKD, which has heightened tensions with politicians from the party currently in power, and secondly, the sale of an apartment complex in which miners employed by this company reside.

   Exhibit 4: Article published on August 2, 2015 in HRAD.CZ and free translation thereof

18. Following the acquisition of OKD in 2004, the plaintiff and his partners restructured the company in order to focus its main activity on coal mining.

   Evidence: Examination or deposition of the parties

19. In 2008, they successfully conducted an IPO of the parent company, NWR, on the London, Prague and Warsaw stock markets.

   Exhibit 9: Press release related to the NWR IPO and free translation thereof

20. Following its initial public offering, NWR invested approximately USD 1.7 billion in OKD, which paid the Czech state the approximate equivalent of USD 1.8 billion in taxes.

    Evidence: Examination or deposition of the parties

21. During the past few years, OKD, like its competitors, has suffered from the global decline in energy prices, which has particularly affected coal prices.

    Widely known fact

    Evidence: Examination or deposition of the parties

22. Many companies that are active in coal worldwide have declared bankruptcy and had to cease their operations. This trend can still be observed today in the United States, Australia, China as well as in Europe.

    Widely known fact

    Evidence: Examination or deposition of the parties

23. In 2014, the plaintiff and his partners participated in the complete financial restructuring of NWR in order to improve the company's financial health, notably including a cash infusion of approximately 75 million euros by the defendant and his partners.

    Exhibit 10: Press releases of July 18 and October 7, 2014 and free translation thereof

    Evidence: Examination or deposition of the parties

24. Notwithstanding the measures taken by the partners, the company was declared insolvent in 2016.

    Evidence: Examination or deposition of the parties

    Exhibit 11: Decision of the Regional Court of Ostrava of May 9, 2016 and free translation thereof

25. As concerns the apartments, the plaintiff is wrongfully accused of not having kept a promise that he supposedly made to the miners, i.e. that they could purchase the apartments they occupied as tenants.

    Exhibit 12: Video posted on Facebook

    Exhibit 13: Transcription of the content of the video and free translation thereof

26. However, this right of pre-emption could only be exercised in case of individual sale of each apartment and could not be granted if the entire company and its assets were sold to a third party.

    Evidence: Examination or deposition of the parties

    Exhibit 14: Article published by Czech Online News on April 28, 2017 and free translation thereof

27. The falseness of these allegations is demonstrated by the fact that last April, Arca Capital filed an insolvency request against Residomo, the company that owns the apartments, on the grounds that the latter had created damages of approximately CZK 24 billion for tenants.

    Exhibit 14: Article published by Czech Online News on April 28, 2017 and free translation thereof

28. The Court immediately rejected this request, which was considered unjustified, and ordered Arca Capital to pay a fine of CZK 50,000 in order to prevent it from submitting requests of this type in the future.

   Exhibit 14: Article published by Czech Online News on April 28, 2017 and free translation thereof

## B. VIOLATION OF THE PLAINTIFF'S PERSONAL PROTECTION RIGHTS

### 1. Posts on Facebook

29. On April 7 and 19, 2017, an incendiary and sensationalistic video about the afore-mentioned facts was posted on Facebook.

   Exhibit 12: Video posted on Facebook

30. This video, depicting the plaintiff, was posted in English on the Facebook page known as "Bloody Money of Blackstone, Citibank and CBRE" and in Czech on the Narodni Zajem Facebook page.

   Exhibit 15: Screenshot of the Facebook page "Bloody Money of Blackstone, Citibank and CBRE"

   Exhibit 16: Screenshot of the Facebook page "Narodni Zajem" and free translation thereof

31. The Czech version has been viewed more than 757,000 times, and the English version has been viewed more than 71,000 times since its posting.

32. The Facebook page on which this video was posted is administered by Narodni Zajem.

   Exhibit 16: Screenshot of the Facebook page "Narodni Zajem" and free translation thereof

33. Some technical research shows that the domain name narodnizajem.com belongs to Arca Capital, i.e. the defendant's company.

   Exhibit 17: Information about the domain name "Narodni Zajem" and free translation thereof

34. The defendant was one of the first to share this posting on his Facebook page.

   Exhibit 18: Screenshot of video shares and free translation thereof

35. FG Financial Group, a subsidiary of the defendant's company Arca Capital, as well as two employees of the latter also shared this video the day after its posting.

   Exhibit 18: Screenshot of video shares and free translation thereof

36. FG Financial Group also posted the video on its website.

   Exhibit 19: Screenshot of the FG Financial website and free translation thereof

37. A large number of comments were posted on Facebook in relation to the video.

Exhibit 20: Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof.

38. These posts include numerous death threats and threats of violence.

    Exhibit 20: Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof.

39. The following comments can be cited as examples:

    - *"Hey, who's going to kill Bakala? That son of a bitch"*;
    - *"What a bastard. Son of bitch. I think he should die suffering"*;
    - *"He's an insect who should be stepped on"*;
    - *"These fat swine should be executed"*;
    - *"Put them all up against the wall and shoot them"*;
    - *"If someone killed this son of a bitch tomorrow, it would be too late! Trash!!!"*;
    - *"Kill this bastard"*;
    - *"Son of a bitch... Lynch him"*;
    - *"This son of a bitch deserves nothing less than a 9 mm hole between the eyes."*

    Exhibit 20: Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof.

40. After these hate-filled and threatening comments, the administrator of the Facebook page left a comment inviting the posters to come protest in Nyon.

    Exhibit 20: Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof.

41. His response was, in effect, as follows: *"We have to do something! A protest against the misappropriation of OKD's assets is being organized outside Zdenek Bakala's property in Switzerland."*

    Exhibit 20: Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof.

42. The death threats and hate-filled comments continued after this response.

    Exhibit 20: Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof.

43. In effect, following the invitation to the protest, the following comments were posted:

    - *"Throw him in a mineshaft and bury him"*;
    - *"Kill this asshole"*;
    - *"Throw him in a stone crusher"*;
    - *"If the President supports him, he probably sucked his dick, and Bakala has to be killed."*

Exhibit 20: Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof.

**2. Protest in front of the plaintiff's residence**

44. On April 20, 2017, the defendant informed the media that he was preparing a four-day protest in front of the plaintiff's residence in Nyon.

    Exhibit 21: Interview published in Lidové noviny on April 22, 2017 and free translation thereof.

45. According to the daily newspaper Lidové noviny, he said that he had submitted an official request for a protest permit to the Nyon police.

    Exhibit 21: Interview published in Lidové noviny on April 22, 2017 and free translation thereof.

46. The defendant told the press that the goal of the protest was *"to make Bakala's life difficult in a place where he presents himself as a respectable businessman and investor."*

    Exhibit 21: Interview published in Lidové noviny on April 22, 2017 and free translation thereof.

47. According to an interview with the defendant broadcast on the online TV channel Seznam, he also said that he would be protesting, if necessary even without a permit:

    Exhibit 22: Video of April 25, 2017 on the online TV channel Seznam.

    Exhibit 22a: Transcription of the video of April 25, 2017 and free translation thereof.

48. …and that it would be possible for protesters to *"release their anger"* during the protest.

    Exhibit 22: Video of April 25, 2017 on the online TV channel Seznam.

    Exhibit 22a: Transcription of the video of April 25, 2017 and free translation thereof.

49. It was written in articles in the Czech press that more than one thousand persons might participate in this protest.

    Exhibit 21: Interview published in Lidové noviny on April 22, 2017 and free translation thereof.

50. According to the daily newspaper Lidové noviny, the defendant said that he was thinking about *"chartering a train"* to go to Switzerland.

    Exhibit 21: Interview published in Lidové noviny on April 22, 2017 and free translation thereof.

51. According to the local press, he also said that it was possible that hooligans from the Banik Ostrava soccer club would participate in the protest.

    Exhibit 21: Interview published in Lidové noviny on April 22, 2017 and free translation thereof.

52. A visit to the Banik Ostrava club website demonstrates the violence and aggression that some supporters of this club engage in.

    Exhibit 23: Article published on the Czech Radio website on March 25, 2014.

53. When the reporter from the daily newspaper Lidové noviny asked the defendant if the participation of such hooligans posed a threat, the defendant responded that he was waiting for official confirmation but that he would make a bus available for them and that he would pay for their trip.

8

Exhibit 21: Interview published in Lidové noviny on April 22, 2017 and free translation thereof.

54. It should be specified that the daily newspaper Lidové noviny is published by the publishing house MAFRA, which belongs to the company of the Minister of Finance, Andrej Babis.

    Exhibit 7: Article in Politico on October 29, 2015 and free translation thereof

55. The plaintiff's attorneys notified the City as well as the police of Nyon of these threats. The local authorities recommended that the plaintiff and his family should not stay in their home in Nyon during the scheduled days of protest.

    Exhibit 24: Exchange of e-mails with the City of Nyon on May 3 and 5, 2017

    Evidence: Questioning of Ms. Carine Loup

56. The family followed the advice of the police and left Switzerland for the period of one week, which meant that the children had to be taken out of school for one week prior to the end of the school year.

    Evidence: Examination or deposition of the parties

57. On last June 9, the defendant informed the local press that he planned to cancel the protest planned in Nyon and that he preferred to organize an event in the Czech Republic.

    Exhibit 25: E-mail of June 12, 2017 from the police of the Canton of Vaud

58. On June 22, 2017, Ms. Sarah Miéville, deputy city secretary of the City of Nyon, informed the plaintiff's counsel by telephone that she had received official notification from the defendant, confirming that the protest would not be taking place.

    Evidence: Examination or even deposition of the parties

59. However, since this information reached the plaintiff only 5 days prior to the protest date, the plaintiff had already taken the necessary security measures in order to protect his family and his property, as will be described below.

    Evidence: Examination or deposition of the parties

60. In addition, the possibility of an illegal protest could not be excluded, in light of the context and the defendant's statements to the media, notably owing to the fact that he had said that the protest would take place even without a permit.

    Exhibit 22: Video of April 25, 2017 on the online TV channel Seznam.

    Exhibit 22a: Transcription of the video of April 25, 2017 and free translation thereof.

61. The defendant also widely used the media to broadcast his call to protest in front of the plaintiff's residence. As such, there remained a risk that, at their own initiative, a group of protesters would go to Nyon on the initially scheduled dates.

    Exhibit 22: Video of April 25, 2017 on the online TV channel Seznam.

    Exhibit 22a: Transcription of the video of April 25, 2017 and free translation thereof.

    Evidence: Examination or deposition of the parties

3. **Agitation around the plaintiff's residence**

62. The defendant's accusations against the plaintiff in the media and the posting of the video on Facebook generated interest in the media.

    Evidence:    Examination or deposition of the parties

63. Following the threat of protest launched by the defendant, a Czech television network came to Switzerland in order to report on the plaintiff's life in Nyon in relation with the protest. This report was broadcast on April 30, 2017.

    Exhibit 26:    Report on the Czech channel TV Nova on April 30, 2017

    Exhibit 26a: Transcription of the video of April 30, 2017 and free translation thereof

64. Said report contains particularly detailed images of the plaintiff's house taken from the entrance as well as wide shots of his residence taken from the lake!

    Exhibit 26:    Report on the Czech channel TV Nova on April 30, 2017

    Exhibit 26a: Transcription of the video of April 30, 2017 and free translation thereof

65. It also showed many details about the security system installed in the plaintiff's home, notably the placement of surveillance cameras and the fact that barbed wire was installed in the hedges.

    Exhibit 26:    Report on the Czech channel TV Nova on April 30, 2017

    Exhibit 26a: Transcription of the video of April 30, 2017 and free translation thereof

66. The reporter also rang the plaintiff's doorbell without success.

    Exhibit 26:    Report on the Czech channel TV Nova on April 30, 2017

    Exhibit 26a: Transcription of the video of April 30, 2017 and free translation thereof

67. She also interviewed the plaintiff's neighbors.

    Exhibit 26:    Report on the Czech channel TV Nova on April 30, 2017

    Exhibit 26a: Transcription of the video of April 30, 2017 and free translation thereof

68. The reporter commenting on the report stressed that Krupa's main goal *"is to cast opprobrium on the former coal baron in his new place of residence."* And she concluded by saying *"Bakala's neighbors do not know him yet, but something tells me that in two months they'll know him very well."*

    Exhibit 26:    Report on the Czech channel TV Nova on April 30, 2017

    Exhibit 26a: Transcription of the video of April 30, 2017 and free translation thereof

69. Furthermore, on May 1, 2017, an unknown person approached the gate at the entrance to the plaintiff's residence.

    Exhibit 27:    Criminal complaint on May 2, 2017

    Exhibit 28:    Video recording taken by the security camera on May 1, 2017 (particularly between 6:40 and 9:40 minutes)

70. He posed in front of the house and had his photo taken by a woman who accompanied him.

    Exhibit 27:    Criminal complaint on May 2, 2017

Exhibit 28: Video recording taken by the security camera on May 1, 2017 (particularly between 6:40 and 9:40 minutes)

71. These two people were speaking Czech to each other and they mentioned the defendant's name.

    Evidence: Questioning of Ms. Catherine Ann Gibson

72. A vehicle from the property, transporting the plaintiff's three-year-old daughter, arrived at this time, and the gate was opened. The man took this opportunity to enter the plaintiff's property and to take a photo with his cell phone.

    Exhibit 27: Criminal complaint on May 2, 2017

73. It should be remembered that the plaintiff lives in this house with his four children.

    Evidence: Examination or deposition of the parties

74. In light of the context and threats described above, he could not reasonably tolerate having unknown persons enter his residence without fear for the safety of his children.

    Evidence: Examination or deposition of the parties

75. A criminal complaint was filed for these facts with the Nyon police.

    Exhibit 27: Criminal complaint on May 2, 2017

76. It should be mentioned that no incident of this type had occurred since the plaintiff and his family had been living in Switzerland, i.e. eight years.

    Evidence: Examination or deposition of the parties; absence of evidence to the contrary

## 4. Damages

77. The plaintiff increased security around his property for five days following the trespassing described above, in order to prevent a similar event from occurring again.

    Exhibit 29: Invoice from the company Service d'Intervention Rapide SA of May 26, 2017

78. The costs associated with this measure come to CHF 1,982.90.

    Exhibit 29: Invoice from the company Service d'Intervention Rapide SA of May 26, 2017

79. To deal with these incitements to violence and with the risks incurred for his physical integrity, his family's and his property, the plaintiff had to hire the services of the company Service d'Intervention Rapide SA ("SIR SA"), so that it could send a security team consisting of three persons, i.e. two agents during the day and one at night, to monitor the house 24 hours a day during the week in which the protest was planned, i.e. from June 27 to July 3, 2017.

    Evidence: Questioning of Mr. Sébastien Damon (employee of SIR SA)

    Exhibit 30: Proposal from the company Service d'Intervention Rapide SA of May 29, 2017 and acceptance of the quote

    Exhibit 31: Confirmation of the purchase order of June 1, 2017

80. The cost of these essential measures comes to CHF 15,238.80

11

Exhibit 30: Proposal from the company Service d'Intervention Rapide SA of May 29, 2017 and acceptance of the quote

Exhibit 31: Confirmation of the purchase order of June 1, 2017

## IV. LAW

### 1. Litigious value

In accordance with CPC Art. 91, line 1, the litigious value is determined by the submissions. In this case, the amount of the damages established by the plaintiff is CHF 17,221.70, corresponding to the litigious value.

### 2. Jurisdiction

Under the terms of Art. 5, point 3 of the Lugano Convention concerning jurisdiction, the recognition and execution of judgments in civil and commercial matters which entered into effect on January 1, 2011 (LC):

> "*A person domiciled in a Contracting State may, in another Contracting State, be sued:*
>
> *in matters relating to tort, delict or quasi-delict, in the **courts for the place where the harmful event occurred**"* (our bolding).

As concerns actions in tort, CPC Art. 36 states:

> "*The court at the domicile or registered office of the aggrieved person or the defendant, or **where the act occurred or had its effect** has jurisdiction over actions in tort.*" (our bolding)

In this case, the defendant organized a four-day protest, from June 27 to 30, 2017, in front of the plaintiff's domicile in Nyon. This city is thus the place where the aggrieved person's interests were effectively attacked, since the plaintiff did not have any other choice but to increase security around his residence in order to protect himself and his family from bodily injury, and to protect his assets and property. The costs related to this increased security constitute damages.

Both the plaintiff's domicile and the place where the tort had its effect are located in Nyon. Consequently, the present Court has jurisdiction as regards the defendant.

### 3. Applicable law

In the absence of any choice of law (CPIL Art. 132), of the habitual residence of the tortfeasor and the aggrieved party in the same State (CPIL Art. 133, line 1) or of any pre-existing legal relationship between them (CPIL Art. 133, line 2), the claims arising from a tort are, according to CPIL Art. 133, line 2:

"governed by the law of the State in which the tort was committed. However, if the injury occurs in another State, the law of that State shall be applicable if the tortfeasor should have foreseen that the injury would occur there."

As described above, the place where the tort occurred is Switzerland. Furthermore, by organizing a protest in front of the defendant's residence in Nyon, the defendant had to expect that the result of his tort would occur in Nyon, i.e. damage to the plaintiff's physical integrity or his family's, to their assets and their property, as well as the damage incurred by the cost of security implemented to counter the threats. Consequently, Swiss law is applicable here.

## 4. Conciliation procedure

According to CPC Art. 199, line a, *"the plaintiff may unilaterally waive conciliation: if the defendant's registered office or domicile is abroad."*

In the present case, the defendant is domiciled in Slovakia.

The plaintiff has thus decided to waive the conciliation procedure, in compliance with the aforementioned article.

## 5. On the merits

Under the terms of Art. 41 of the Code of Obligations:

> *[1] Any person who unlawfully causes loss or damage to another, whether willfully or negligently, is obliged to provide compensation.*
>
> *[2] A person who willfully causes loss or damage to another in an immoral manner is likewise obliged to provide compensation.*

According to prior case law of the Federal Court[1]:

> *"The liability in tort established by CO Art. 41 supposes that the four following conditions are met simultaneously: a tort, caused by a tortfeasor, damage, and a relationship of causality (natural and sufficient) between the tort and the damage."*

An act is wrongful if it infringes on a general legal right, causing harm either to an absolute right of the aggrieved person, or to his property; in the latter case, the standard that is infringed on must have as its goal the protection of the aggrieved person in the rights infringed on by the incriminated act[2].

The defendant undertook a media campaign against the plaintiff during which he bragged about launching virulent attacks against the latter. These attacks included clear incitements for the public to attack the latter's person and property. Unafraid of any consequences, the defendant organized

---

[1] ATF (Arrêt du Tribunal Fédéral [Decision of the Federal Court]) 132 III 122 of September 13, 2015, consid. 4.1 (and references cited).
[2] Ibid. consid. 4.1

13

a hate-filled protest in front of the plaintiff's residence and invited Czech miners and hooligans to participate, while offering to pay their travel expenses. The protest was announced in various manners, notably in hate-filled, insulting and threatening comments to a video posted on Facebook accusing the plaintiff (see points 29-43). The incitement to violence during the protest is thus clear, since the event was publicized following comments calling for the plaintiff to be murdered. Affecting the plaintiff's absolute right to his bodily integrity, the incitement to violence constitutes a tort.

The tort supposes solely the capacity of discernment, without any awareness of the unlawful nature of the act being necessary[3] nor any awareness of all the possible consequences of the act[4]. In the present case, there is no doubt about the defendant's fault: not only does he have the capacity of discernment, but furthermore it is with awareness and free will that he incited violence against the plaintiff. He was aware of the prejudicial effects of his acts, and he wanted this result.

The damage consists in the involuntary decrease in wealth, i.e. the difference between the aggrieved person's current wealth and what his wealth would have been without the prejudicial event[5]. In this particular case, the damage results from the costs incurred by the security measures taken by the plaintiff to protect his person, his family and his assets. The damage is thus directly related to the calls for violence launched by the defendant. The damage corresponds to the costs incurred by the hiring of the security company to ensure the security of the plaintiff's residence during the week in which the protest was scheduled. The cost of these measures was CHF 17,221.70.

In accordance with prior case law of the Federal Court, the relationship of causality is sufficient when the event under consideration was capable, according to the ordinary course of things and general experience in life, of leading to a result of the same kind as that which occurred. To determine if a fact is the sufficient cause of a tort, the judge proceeds with an objective retrospective prognosis: placing himself at the end of the chain of causes, he must retrace the damage for which compensation is being requested, in order to determine liability, and determine whether, in the normal course of things and general experience in human life, such a consequence remains within the reasonable field of objectively foreseeable possibilities; in this regard, it is not the subjective foreseeability but rather the objective foreseeability of the result which counts[6].

In the context of the defendant's incitements to attack the defendant and his assets, the organization of a protest in front of the plaintiff's residence, to which the defendant invited furious miners and hooligans from the Czech Republic, is objectively of a nature to create a threat for the physical integrity of the persons sharing this residence as well as against their assets. Such a protest is essentially prone to degenerating into acts of violence. It is thus clear and foreseeable that the likely victim of such acts would take measures to guarantee security around his residence, in front of which the protest was supposed to occur.

---

[3] ATF 91 II 25 of March 16, 1965, consid. 7 (and references cited).
[4] ATF 90 II 9 of January 21, 1964 consid. 4.
[5] Braconi/Carron/Scyboz in Code of Obligations, annotated, 9th edition, Art. 41, p. 38.
[6] Decision of the Federal Court 5C.156/2003 of October 23, 2003, consid. 3.1 (and references cited).

In light of the preceding, the plaintiff requests compensation for the damage caused by the defendant.

***

Established in Geneva, on July 14, 2017


For the Plaintiff:

Philippe Neyroud                                                                            Jean-Marc Carnicé

| | |
|---|---|
| Exhibit 6: | Article published on February 25, 2016 in BLESK.CZ and free translation thereof |
| Exhibit 7: | Article in Politico on October 29, 2015 and free translation thereof |
| Exhibit 8: | Excerpts from the Trade Register for Agrofert and MAFRA and free translations thereof |
| Exhibit 9: | Press release related to the NWR IPO and free translation thereof |
| Exhibit 10: | Press releases of July 18 and October 7, 2014 and free translation thereof |
| Exhibit 11: | Decision of the Regional Court of Ostrava of May 9, 2016 and free translation thereof |
| Exhibit 12: | Video posted on Facebook |
| Exhibit 13: | Transcription of the content of the video and free translation thereof |
| Exhibit 14: | Article published by Czech Online News on April 28, 2017 and free translation thereof |
| Exhibit 15: | Screenshot of the Facebook page "Bloody Money of Blackstone, Citibank and CBRE" |
| Exhibit 16: | Screenshot of the Facebook page "Narodni Zajem" and free translation thereof |
| Exhibit 17: | Information about the domain name "Narodni Zajem" and free translation thereof |
| Exhibit 18: | Screenshot of video shares and free translation thereof |
| Exhibit 19: | Screenshot of the FG Financial website and free translation thereof |
| Exhibit 20: | Screenshot of comments posted on the "Narodni Zajem" Facebook page and free translation thereof. |
| Exhibit 21: | Interview published in Lidové noviny on April 22, 2017 and free translation thereof. |
| Exhibit 22: | Video of April 25, 2017 on the online TV channel Seznam. |
| Exhibit 22a: | Transcription of the video of April 25, 2017 and free translation thereof. |
| Exhibit 23: | Article published on the Czech Radio website on March 25, 2014. |
| Exhibit 24: | Exchange of e-mails with the City of Nyon on May 3 and 5, 2017 |
| Exhibit 25: | E-mail of June 12, 2017 from the police of the Canton of Vaud |
| Exhibit 26: | Report on the Czech channel TV Nova on April 30, 2017 |
| Exhibit 26a: | Transcription of the video of April 30, 2017 and free translation thereof |
| Exhibit 27: | Criminal complaint on May 2, 2017 |

| | |
|---|---|
| Exhibit 28: | Video recording taken by the security camera on May 1, 2017 (particularly between 6:40 and 9:40 minutes) |
| Exhibit 29: | Invoice from the company Service d'Intervention Rapide SA of May 26, 2017 |
| Exhibit 30: | Proposal from the company Service d'Intervention Rapide SA of May 29, 2017 and acceptance of the quote |
| Exhibit 31: | Confirmation of the purchase order of June 1, 2017 |

***

For the Plaintiff:

Philippe Neyroud                              Jean-Marc Carnicé



City of New York, State of New York, County of New York

I, Jordan Johnson, hereby certify that the documents are, to the best of my knowledge and belief and within the given parameters, true and accurate translations from French into English:

**Argumentace Krúpa**

Décision d'irrecevabilité

Dopis o zpětvzetí žaloby ze strany Bakala_27-9-2018

Znění žaloby

_____
Jordan Johnson

Sworn to before me this
November 5, 2018

_____
Signature, Notary Public

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE