## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | | |
|---|---|---|
| Zdenek Bakala, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 9:18-cv-2590-DCN |
| | ) | |
| -against- | ) | |
| | ) | **RICO CASE STATEMENT** |
| Pavol Krupa, Adam Swart, and Crowds | ) | |
| on Demand LLC, | ) | |
| | ) | |
| *Defendants*. | ) | |

Pursuant to this Court's Order, dated December 5, 2018, Plaintiff Zdenek Bakala submits the following RICO Case Statement. Mr. Bakala's investigation into this matter continues. Mr. Bakala expects to come into possession of additional evidence supporting his claims as his investigation and discovery proceed. Mr. Bakala reserves the right to amend and/or supplement this Statement.

**1.      State whether the alleged unlawful conduct is in violation of any or all of the provisions of 18 U.S.C. §§ 1962(a), (b), (c), and/or (d).**

Mr. Bakala alleges that Defendants' conduct in this action is in violation of 18 U.S.C. §§ 1962(c) and (d).

**2.      List each person and state the alleged misconduct and basis of liability of each person.**

The Defendants in this action are Pavol Krupa ("Krupa"); Crowds on Demand LLC ("Crowds"); and Crowds on Demand CEO Adam Swart ("Swart"). Krupa is a Slovak businessman and the founder of a company called Arca Capital, as well as the newly established Krupa Global Investments. Arca Capital and Krupa Global Investments constitute an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Arca/Krupa Global Enterprise").

The Arca/Krupa Global Enterprise is directed by Krupa who financed, developed, and implemented the RICO Fraud/Extortion Scheme.

In violation of 18 U.S.C. § 1962(c), Krupa, Crowds, and Swart conducted and participated in the conduct of the Arca/Krupa Global Enterprise affairs, directly or indirectly, through a pattern of racketeering activity attempting to unlawfully seize control of properties and extort payments from numerous victims ("the RICO Fraud/Extortion Scheme"), including but not limited to: Mr. Bakala, Blackstone, and Round Hill Capital.

Krupa hatched the RICO Fraud/Extortion Scheme to extort millions of dollars from Mr. Bakala. Krupa participated in the operation or management of the Arca/Krupa Global Enterprise by providing instruction, material support, and financing to implement the RICO Extortion/Fraud Scheme. Krupa also solicited and hired agents to assist and fulfill necessary roles in the implementation of the RICO/Fraud Extortion Scheme.

Swart and Crowds (together, the "Swart Defendants"), for their part, also participated in the operation or management of the Arca/Krupa Global Enterprise by providing direction, instruction, material support, and financing to implement the RICO Extortion/Fraud Scheme. The Swart Defendants also solicited and hired agents to assist in and fulfill necessary roles in the implementation of the RICO Fraud/Extortion Scheme, including but not limited to, paid actors and fake protestors

In violation of 18 U.S.C. § 1961(1), Krupa and the Swart Defendants engaged in "racketeering activity" including extortion as chargeable under South Carolina State law, S.C. Code Ann. § 16-17-640. In violation of S.C. Code Ann. § 16-17-640, Krupa and the Swart Defendants repeatedly threatened and subsequently implemented a false harassment campaign accusing Mr. Bakala of criminal offenses, unethical conduct, and business misdeeds, in

numerous verbal, written and electronic communications, with the intent to extort money from Mr. Bakala.

Likewise, in violation of 18 U.S.C. § 1951, Krupa and the Swart Defendants attempted to obstruct, delay, or affect commerce through the wrongful use of extortion, threats and demands, which caused Mr. Bakala to fear for his personal and economic well-being as well as the safety of his family. Specifically, Krupa and the Swart Defendants engaged in continuing an extortionate scheme using threats of physical, reputational, and economic harm if Mr. Bakala did not meet their payment demands. The Defendants organized and financed a widespread harassment campaign against Mr. Bakala in the United States by engaging "crowds-for-hire" to create a façade of negative public opinion targeting organizations Mr. Bakala supports, serves, and conducts business with. The purpose of this fake campaign is to harm and instill fear in Mr. Bakala so that he will pay the extortion demand. Krupa and the Swart Defendants also attempted to obstruct, delay, or affect commerce through the wrongful use of extortion, threats and demands, by repeatedly threatening protests and bad publicity unless Blackstone Group and Round Hill Capital would give apartments in the Czech Republic to miners (with whom Arca has a contract giving it a share of any recovery).

In violation of 18 U.S.C. § 1343, Krupa and the Swart Defendants engaged in a scheme or artifice to defraud Mr. Bakala and his business and philanthropic contacts in order to obtain money or property from Mr. Bakala by means of false or fraudulent pretenses and representations. When Mr. Bakala refused to meet this demand, Krupa and the Swart Defendants employed a scheme or artifice to defraud Mr. Bakala's business contacts to induce them to sever business ties with him through numerous false representations as by transmitting or causing to be

transmitted numerous emails and telephone calls by means of wire communication in interstate commerce. In those communications, sent or sponsored by the Swart Defendants, individuals fraudulently pretended to be concerned citizens and repeated false statements about Mr. Bakala, Blackstone Group, and Round Hill Capital.

In violation of 18 U.S.C. § 1952(a), Krupa and the Swart Defendants traveled in interstate and/or foreign commerce and/or used facilities in interstate and foreign commerce (including but not limited to wire, telephone and internet communications), with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activities including extortion in violation of both state and federal law.

In addition to facilitating the pattern of racketeering activity identified above, Krupa and the Swart Defendants agreed and conspired to participate in, or to facilitate the commission of, predicate acts as stated above, and agreed and conspired to facilitate the acts leading to the substantive offense of conducting the affairs of the enterprise through a pattern of racketeering activity, which included the repeated acts alleged above, in violation of 18 U.S.C. § 1962(d).

Krupa and the Swart Defendants also made numerous false and defamatory statements concerning Mr. Bakala (*See* Am. Compl. ¶¶ 129-136) and tortiously interfered with Mr. Bakala's prospective contractual relations (*See* Am. Compl. ¶¶ 137-140).

> **3.** **List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each.**

Mr. Bakala has a reasonable and good faith basis to believe that there are other wrongdoers who will be identified during the course of discovery, including individuals who may have directed, approved, facilitated, and/or known about the Defendants' scheme to threaten and harass Mr. Bakala with the intent to extort money.

**4.      List the alleged victims and state how each victim was allegedly injured.**

Zdenek Bakala is a victim of the RICO Extortion/Fraud Scheme.  Mr. Bakala has suffered economic injuries to his business, property, and reputation, as well as other injuries and damages to be proven at trial, as a direct and proximate result of the Arca/Krupa Global Enterprise's racketeering activity, including its predicate acts.  For example, Mr. Bakala's professional and business reputation and business goodwill have been damaged.  Further, Mr. Bakala has suffered damages to current or potential business opportunities, as well as damage to his existing business and professional relationships.  As alleged in the Amended Complaint, the Defendants sent harassing emails and made harassing telephone calls in order to damage Mr. Bakala's existing relationship with the following entities: Dartmouth College and Dartmouth's Tuck School of Business, Blackstone Group, Round Hill Capital, The Aspen Institute, The Design Museum, and The Dox Centre for Contemporary Art.  The Defendants also hired actors to protest at the offices of Berkshire Hathaway in Omaha, Nebraska, in order to interfere with Mr. Bakala's potential business relationships with Berkshire Hathaway.  Further, the Defendants sent false and defamatory emails to Amundi—the purchaser of one of Mr. Bakala's companies, North-Line.  Due to the false, harassing, and defamatory statements made to Amundi, Mr. Bakala's negotiating position was weakened, his costs of doing business increased, and he was forced to spend money on professional services and legal costs to rebut and respond to these statements to Amundi.  The Defendants' actions—including their repeated false statements that Mr. Bakala is a criminal, engaged in misconduct related to the Karbon Invest transaction and left miners homeless—have interfered with and damaged Mr. Bakala's professional and business reputation, as well as increased Mr. Bakala's cost of doing business.  Further, Mr. Bakala has

been forced to spend money to respond to the Defendants' actions (beyond the expenses Mr. Bakala has incurred in bringing this lawsuit). For example, Mr. Bakala has spent money on professional services and attorneys' fees to provide clarifications, explanations, and reassurances to his business and professional contacts (*e.g.,* Dartmouth, The Aspen Institute) in response to the false and defamatory emails and harassing phone calls those entities received from the Defendants.

In addition to Mr. Bakala, there are other victims of the enterprise's RICO activities who have been injured by the Defendants' attempts to unlawfully seize control of properties and extort payments, including Blackstone Group, Round Hill Capital, and General Electric.

5. **Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering shall include the following information:**

  a. **List the alleged predicate acts and the specific statutes which were allegedly violated;**

Krupa and the Swart Defendants committed, directed, and aided and abetted in the commission of numerous acts of racketeering activity including (1) wire fraud (that is, using the wires in connection with a scheme to fraudulently obtain another's property) in violation 18 U.S.C. § 1343; (2) Hobbs Act extortion (that is, using wrongful threats in order to obtain another's property) in violation 18 U.S.C. § 1951; (3) state-law extortion (S.C. Code § 16-17-640) (that is, accusing another of a crime or exposing another's business acts with the intent to extort) in violation 18 U.S.C. § 1961(1); and (4) violations of the Travel Act (that is, engaging in interstate travel in aid of racketeering enterprises) in violation of 18 U.S.C. § 1952.

**b.** **Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;**

Since at least April 2017, Defendants have engaged in racketeering and a scheme to defraud and to harm Mr. Bakala's business and property by, among other things, threatening and implementing a false harassment campaign accusing Mr. Bakala of criminal offenses, unethical conduct, and business misdeeds, in numerous verbal, written and electronic communications, with the intent to extort money from Mr. Bakala. To facilitate this scheme, Defendants conducted and/or participated in the conduct of the Arca/Krupa Global Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity including, but not limited to, the following predicate acts:

| Date | Statute | Participants | Relevant Facts |
|---|---|---|---|
| April-October 2017 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion) | Pavol Krupa | Krupa contacted an attorney associated with Mr. Bakala, and in communications which followed, Krupa demanded that Mr. Bakala pay him 500 million crowns (approximately $23 million) in exchange for ceasing the harassment campaign against Mr. Bakala. If Mr. Bakala paid Krupa, Krupa indicated he would: stop all actions abroad; not supply materials that he said had been requested by authorities in London; abandon plans for new actions in the US and Norway; cease all "public relations" activities; abandon a private investigation into NWR's IPO; withdraw legal petitions; and cease cooperation in filed criminal complaints. When Mr. Bakala refused to meet this demand, Krupa employed a scheme or artifice to defraud Mr. Bakala's business contacts to induce them to sever business ties with him through numerous false representations. |

| | | | |
|---|---|---|---|
| July 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Defendants orchestrated a campaign of harassment and extortion against Blackstone Group and Round Hill Capital, sending dozens of harassing emails threatening marches and bad publicity if the companies did not "give back flats to miners."  In particular, one email from a Crowds employee threatened: "You're going to need to make this right, and soon.  More protests are planned.  The protests I mentioned were multi-day affairs, and both protesters and miners are looking to make a bigger scene, perhaps on your own doorsteps." |
| July 5, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants used a facility of interstate or foreign commerce to carry on and perform an unlawful activity by using interstate or foreign facilities to transmit an email.  On July 5, 2018, Swart emailed the Dean of the Tuck School of Business at Dartmouth College in an attempt to damage Mr. Bakala's reputation and destroy his relationship with the school. |
| July 11, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants used a facility of interstate or foreign commerce to carry on and perform an unlawful activity by using interstate or foreign facilities to transmit an email.  On July 11, 2018, Swart sent an email to the General Counsel for The Aspen Institute insisting that Mr. Bakala be expeditiously removed from the organization. |

| Date | Statutes | Defendants | Description |
|---|---|---|---|
| July 16, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants used a facility of interstate or foreign commerce to carry on and perform an unlawful activity by using interstate or foreign facilities to transmit an email. On July 16, 2018, Swart emailed the Dartmouth President's office in an attempt to damage Mr. Bakala's reputation and destroy his relationship with the school. |
| July 19, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants used a facility of interstate or foreign commerce to carry on and perform an unlawful activity by using interstate or foreign facilities to transmit an email. On July 19, 2018, Swart contacted Amundi, the potential purchaser of North-Line in an attempt to smear Mr. Bakala and disrupt a pending real estate transaction. |
| August 8-9, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants continued their campaign of extortion, interference, and defamation by targeting Mr. Bakala's home in Hilton Head. On August 8-9, 2018, twelve "protestors," who upon information and belief were individuals paid by Defendants, converged at Hilton Head Plantation, Hilton Head Island, South Carolina. These paid protesters marched with signs ("Scammer of the Decade Lives Here") and chanted: "Bakala is a creep! He'll steal your home while you sleep!" as well as "Bakala's a piece of s**t! He takes your home and then he splits!" |

| | | | |
|---|---|---|---|
| August 9, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants used a facility of interstate or foreign commerce to carry on and perform an unlawful activity by using interstate or foreign facilities to transmit an email. On August 9, 2018, an individual using the email address— rebecca@stopbakala.org—threatened future protests, possibly at The Aspen Institute, unless The Aspen Institute engaged with StopBakala.org. |
| August 13, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants used a facility of interstate or foreign commerce to carry on and perform an unlawful activity by using interstate or foreign facilities to transmit an email. On August 13, 2018, "Oscar Feria" sent an email to a professor at Dartmouth's Tuck School of Business threatening that "[t]o avoid protestors at your door, perhaps it might be best to consider his association with your board…" Another email sent by "Gregory Jackson" on August 7, 2018, stated "Miners have already started protesting in New York City, Buffalo, and Omaha. We will be at your company next!" Another individual left a voice message for an official at Dartmouth on behalf of StopBakala.org, threatening protests at Dartmouth: "We're probably going to be coming to the school to come and talk to you in person. So, please reach back out over the phone that way we can just avoid coming to the school and having you know, maybe a group of people standing outside chanting on behalf of this criminal that we're after. So, give us a call and we can go ahead and resolve it." |

| | | | Having devised or intended to devise a scheme to defraud and to harm Mr. Bakala's business and property, Defendants used a facility of interstate or foreign commerce to carry on and perform an unlawful activity by using interstate or foreign facilities to transmit an email. On August 28, 2018, an individual using the email address— rebecca@stopbakala.org— sent an email to the executive assistant to the Dean of the Tuck School of Business falsely claiming that "Mr. Bakala is facing civil litigation and criminal investigation in the Czech Republic, the United States, Switzerland, Poland, and the United Kingdom." The executive assistant also received harassing phone calls at 3:47 p.m. and 3:54 p.m. on August 28, 2018. |
|---|---|---|---|
| August 28, 2018 | 18 U.S.C. § 1951 (Hobbs Act Extortion)<br><br>18 U.S.C. § 1961(1) (State Law Extortion)<br><br>18 U.S.C. § 1952 (Travel Act)<br><br>18 U.S.C. § 1343 (Wire Fraud) | Pavol Krupa<br><br>Crowds on Demand<br><br>Adam Swart | |

      **c.**      **If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated in particularity." Fed. R. Civ. P. 9(b). Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged presentations were made;**

As noted in the above-identified predicate acts, Defendants committed multiple violations of the Travel Act (18 U.S.C. § 1952) by repeatedly using facilities in interstate or foreign commerce (*i.e.*, using facilities that transmit interstate or foreign emails) to facilitate the promotion, establishment, or carrying on of an unlawful activity, and engaged in multiple violations of wire fraud (18 U.S.C. § 1343) by repeatedly using the telephone and emails in an attempt to effectuate a RICO Fraud/Extortion Scheme through a pattern of racketeering activity in an attempt to unlawfully seize control of properties and extort payments from numerous victims, including Mr. Bakala.

Each predicate act of wire fraud identified above alleges the time, place, content of the

fraudulent communications, how the fraudulent communications were made, and the identity of the parties to the communication.[1]

> **d.     State whether there has been a criminal conviction for violation of the predicate acts;**

None at this time.  However, consistent with the duty of candor and full disclosure, we note that Mr. Bakala has received written notification within the past month from the U.S. Department of Justice, Federal Bureau of Investigation (FBI), that the FBI has identified Mr. Bakala "as a possible victim of a crime" related to the predicate acts.  Further, the FBI notification indicated that the "case is currently under investigation by the FBI."

> **e.     State whether civil litigation has resulted in a judgment with regard to the predicate acts; and**

None at this time.

> **f.     Describe how the predicate acts form a "pattern of racketeering activity."**

>> **1)     State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.**

The alleged predicate acts are related to each other because they have similar purposes—extorting victims and shaking down businesses and individuals for profit—the same participants—Krupa and the Swart Defendants—and the same or similar methods of

---

[1]   Mr. Bakala may prove a predicate act of wire fraud in support of his RICO claims even if the wire transmission containing Defendants' fraudulent representations was neither received by nor relied on by Mr. Bakala.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647-61 (2008) (holding that a plaintiff may establish a RICO claim predicated on mail fraud even if the plaintiff neither received nor relied on the defendant's fraudulent misrepresentation.  Rather, "[t]he [RICO] statute provides a right of action to '[a]ny person' injured by the violation, suggesting a breadth of coverage not easily reconciled with an implicit requirement that the plaintiff show reliance in addition to injury in his business or property"); *see also id.* at 649 (an individual can commit wire fraud "even if no one relies on his fraud") (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 476 (2006) (Thomas, J., concurring in part and dissenting in part)).

commission—using fake protesters, sending harassing and defamatory emails, and making harassing and defamatory phone calls.  In their motion to dismiss, the Swart Defendants have not challenged the fact that the alleged predicate acts are related to each other.

> **2)** **State whether the alleged predicate acts show continuity of racketeering activity, or the threat of continuing racketeering activity. If so, describe in detail.**

The alleged predicate acts show a threat of continuing racketeering activity because Defendants have promised to escalate their harassment campaign against Bakala while demanding millions of dollars to end the harassment campaign.  Defendants have already escalated their harassment campaign to the point of sending fake protesters to Mr. Bakala's home on Hilton Head and disparaging Mr. Bakala's business and philanthropic relationships, with no end in sight.

In addition, Defendants' conduct threatens repetition because they have carried out similar schemes against other victims.  Krupa has engaged in similar "shakedown" schemes against other companies and individuals, including waging a publicity campaign against GE with the hopes of receiving a payout.  For their part, the Swart Defendants boast about crippling a manufacturing business to force the owner to sell for a fraction of its previous value, and using protests to exact a $20 million "settlement" from a target, and Swart has stressed that when he and Crowds get involved, they are "in it for the long haul."

Krupa and the Swart Defendants have teamed up to orchestrate a campaign of harassment and extortion against Blackstone Group and Round Hill Capital similar to the campaign against Mr. Bakala, repeatedly threatening protests and bad publicity unless the two companies give apartments in the Czech Republic to miners.  For example, in the summer and fall of 2018,

individuals at Blackstone Group and/or Round Hill Capital received emails from individuals acting on behalf of Krupa and the Swart Defendants pretending to be concerned citizens, and stating, among other things:

- [Subject: Fair Warning]: As word has slowly begun to spread, so has outrage. Protests have begun to happen. Last week alone there were protests in my hometown of Omaha, and in larger, more visible cities, including New York and Buffalo. The miners want what was contracted to them as theirs, and their supporters will do their utmost to see that it's gotten.

  Protests are likely to spring up next at Blackstone and Round Hill locations. Nothing you can't weather, I'm sure, but it's going to be some publicity, at the least. Don't you think it would be a better idea to take steps to follow through on the contract you took on when Round Hill took on the management of those blocks of housing?

- [Subject: Protests]: Just so you know, protests against financial institutions who were in on the victimization of Ostrava miners have begun, and there are going to be others. You at Round Hill Capital have yet to fulfill the contract with the residents of the housing units your company manages since Blackstone Group purchased it from Zdenek Bakala and New World Resources. Guess where those protestors are looking to set up next. And I understand that management involvement there is not great.

  Please fulfill your obligations. It would be a lot less embarrassing for you than dozens of protestors on your doorstep advertising the mining families you allowed to be forced out of their homes – the homes they were promised they could purchase from Bakala, and later, from you and Blackstone—and it's the right thing to do anyway. The court of public opinion judges harshly. You still have a chance to save yourselves.

- I wonder if you are aware of the protests that took place this past week in New York, Buffalo, and Omaha, on the doorsteps of M&T Bank and Berkshire Hathaway. People are becoming more aware of the plight of a group of coal miners in Ostrava, Czechia, who were bilked out of their homes when Blackstone and Round Hill Capital bought them from New World Resources…New World Resources had struck a contract … but did not honor the contract; once the housing and the contract were sold to Blackstone and Round Hill, those companies also failed to honor it. Your company failed to honor it.

  You're going to need to make this right, and soon. More protests are planned. The protests I mentioned were multi-day affairs, and both protestors and miners are looking to make a bigger scene, perhaps on your own doorsteps. I recommend that you get out in front of this one—as much as you can, this late in the game—and see what can be done about honoring the contract and getting hardworking miners and their families back into the homes that rightfully should have been sold to them several years ago.

- People won't stand for being wronged in this way when their homes and families are on

the line. Do the deal to get these people back in their homes now before it gets more complicated than it already is. That's just good advice.

Adam Swart himself sent several emails and was copied on emails to Blackstone Group and Round Hill Capital. Other emails (including one sent from Crowds on Demand's Daniel Taylor) refer to Adam Swart as the "director" or "boss" of the Coalition to Protect OKD Miners.

Further, Krupa and the Swart Defendants have recently teamed up to carry out yet another campaign of fake protests and harassment against Kraft Heinz Company.[2] These similar schemes against victims other than Bakala show that Defendants' conduct threatens to continue in the future.

> **6.** **Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:**
>
>> **a.** **State the names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;**

Arca Capital and Krupa Global Investments constitute an association-in-fact enterprise referred to as the "Arca/Krupa Global Enterprise."

>> **b.** **Describe the structure, purpose, function and course of conduct of the enterprise;**

The purpose of the Arca/Krupa Global Enterprise is to extort money and property from Mr. Bakala and other victims and profit from that extortion. Krupa financed and developed the Arca/Krupa Global Enterprise's schemes of harassment and extortion, while the Swart Defendants selected and implemented tactics to further the harassment and extortion schemes.

---

[2] *See* https://www.omaha.com/columnists/hansen/hansen-the-protest-that-wasn-t-or-who-are-those/article_b10ddcc5-5369-5e9f-815b-4a47e7b181d5.html.

This course of conduct included threats of extortion, harassing and defamatory phone calls and emails, and fake protests directed at the victims of the extortion.

### c. State whether any defendant is an employee, officer or director of the alleged enterprise;

Krupa is the founder of both of the entities constituting the enterprise, Arca Capital and Krupa Global Investments. But the Arca/Krupa Global Enterprise itself, as an association-in-fact enterprise, does not have any employees, officers, or directors.

### d. State the manner in which each defendant is associated with the alleged enterprise;

Each defendant is associated with the Arca/Krupa Global Enterprise. Krupa directed the enterprise's affairs by financing and developing the enterprise's schemes of harassment and extortion. The Swart Defendants directed the enterprise's affairs by playing a central role in the conception, creation, and execution of the schemes, including creating a website filled with false and defamatory conduct, writing and sending defamatory emails and making harassing phone calls to entities associated with Mr. Bakala's business and philanthropic ventures, threatening and seeking meetings with the targets of their harassment, disseminating the enterprise's message through on-camera news interviews, and soliciting, hiring, and directing fake protesters to march at Mr. Bakala's home in Hilton Head. In interviews, Krupa has acknowledged that he and Swart "work together on other activities," and that Swart "considered it appropriate to implement" the fake Omaha protest with individuals posed as the Coalition to Protect OKD Miners. Krupa also explained that Swart "basically took it upon himself and said that since a US citizen is such a crook, he would do something against him."

     **e.**     **State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that any defendant is the enterprise itself, or a member of the enterprise; and**

Defendants Krupa and Swart are individuals separate from the Arca/Krupa Global Enterprise. Defendant Crowds is an entity that is separate from the Arca/Krupa Global Enterprise.

     **f.**     **If any defendant is alleged to be the enterprise itself, or a member of the enterprise, explain whether such a defendant is a perpetrator, a passive instrument, or a victim of the alleged racketeering activity.**

No defendant is alleged to be the enterprise itself or a member of the enterprise.

**7.**     **State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one activity.**

The Arca/Krupa Global Enterprise exists as an ongoing entity separate and apart from the pattern of racketeering activity in which it is engaged. In this case, the evidence used to prove the pattern of racketeering activity and the evidence establishing the enterprise overlap in significant respects.

**8.**     **Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

As detailed above, the Arca/Krupa Global Enterprise's purpose is to extort money from individuals and entities and to profit from that extortion. The enterprise's pattern of racketeering activity is the vehicle it uses in order to implement and execute its schemes of extortion.

**9.**     **Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

The Arca/Krupa Global enterprise will receive benefits from the alleged pattern of racketeering should any one of their extortion victims decide to pay the money being demanded.

On information and belief, the Arca/Krupa Global Enterprise also stands to profit if OKD apartments are given to the tenants. Some tenants in the OKD apartments signed over their legal rights to the Arca/Krupa Global Enterprise, with Arca standing to receive 50% of any recovery.

**10. Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

The activities of the Arca/Krupa Global Enterprise affect interstate or foreign commerce. As alleged in the Amended Complaint, the enterprise has directed that the extortion scheme be carried out within the United States to affect United States commerce. For example, a video appearing on the StopBakala.org website, which has been distributed by Krupa, the Swart Defendants, and Arca Capital directly, attacks the Blackstone Group, Citibank, and CBRE, which are American companies. The video warns investors and shareholders about investing in those companies due to "unethical, immoral, or illegal proceedings." The scheme has targeted numerous businesses in the United States (including through interstate travel, telephone calls, and emails) with the hopes of affecting business relations Mr. Bakala has with those businesses. It has also targeted American companies that engage in business abroad (*e.g.*, Blackstone Group).

Moreover, the enterprise consistently makes use of the instrumentalities and channels of interstate commerce. For example, members of the enterprise regularly exchange telephone and email communications across state and foreign borders. Further, members of the enterprise have made payments to one another, and in doing so, passed money through the United States' banking system, and intended that funds would be transferred to or from South Carolina across state and foreign borders. The enterprise has also paid money to United States citizens to act as "protestors," and such payments were made via the United States' banking system. At least one of these paid "protestors" engaged in interstate travel at the direction of the enterprise: Crowds'

Daniel Taylor traveled to Omaha, Nebraska, in order to further the activities of the enterprise.

In sum, the Arca/Krupa Global Enterprise engages in or affects interstate commerce, including but not limited to the examples listed above.

**11.    If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

> **a.    State who received the income derived from the pattern of racketeering activity or through the collection of any unlawful debt; and**

> **b.    Describe the use or investment of such income.**

The Amended Complaint does not allege a violation of 18 U.S.C. § 1962(a).

**12.    If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

The Amended Complaint does not allege a violation of 18 U.S.C. § 1962(b).

**13.    If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

> **a.    State who is employed by or associated with the enterprise;**

Defendants Krupa, Swart, and Crowds are all associated with the Arca/Krupa Global Enterprise.  Additional individuals or entities may also be associated with the Arca/Krupa Global Enterprise.

> **b.    State whether the same entity is both the liable "person" and the enterprise under § 1962(c).**

The same entity is not both the liable "person" and the enterprise.  Defendants Krupa, Swart, and Crowds are the liable "persons," while the "enterprise" is the Arca/Krupa Global Enterprise.

**14.     If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the facts showing the existence of the alleged conspiracy.**

As explained above, and incorporated here, each of the Defendants agreed to engage in schemes of extortion and harassment in order to extort money from Mr. Bakala and other victims.  Each of the Defendants agreed and worked together to develop and implement the schemes.  Each of the Defendants agreed and participated in the false and defamatory statements made on the StopBakala.org website.  Each of the Defendants agreed and participated in the harassing and defamatory phone calls and emails.  Each of the Defendants agreed and participated in the decision to hire fake protesters to protest at Mr. Bakala's home on Hilton Head.  Defendants' concerted actions show that a conspiracy to violate RICO existed.

**15.     Describe the alleged injury to business or property.**

As discussed above, Mr. Bakala has suffered numerous economic injuries to his business, property, and reputation, as well as other injuries and damages to be proven at trial, as a direct and proximate result of the Arca/Krupa Global Enterprise's racketeering activity, including its predicate acts.  For example, Mr. Bakala's professional and business reputation and business good will have been damaged.  Further, Mr. Bakala has suffered damages to current or potential business opportunities, as well as damage to his existing business and professional relationships. As alleged in the Amended Complaint, the Defendants sent harassing emails and made harassing telephone calls in order to damage Mr. Bakala's existing relationship with the following entities: Dartmouth College and Dartmouth's Tuck School of Business, Blackstone Group, Round Hill Capital, The Aspen Institute, The Design Museum, and The Dox Centre for Contemporary Art. The Defendants also hired actors to protest at the offices of Berkshire Hathaway in Omaha, Nebraska, in order to interfere with Mr. Bakala's potential business relationships with Berkshire

Hathaway. Further, the Defendants sent false and defamatory emails to Amundi—the purchaser of one of Mr. Bakala's companies, North-Line. Due to the false, harassing, and defamatory statements made to Amundi, Mr. Bakala's negotiating position was weakened, his costs of doing business increased, and he was forced to spend money on professional services and legal costs to rebut and respond to these statements to Amundi. The Defendants' actions, including their repeated false statements that Mr. Bakala is a criminal, engaged in misconduct related to the Karbon Invest transaction and left miners homeless, have interfered with and damaged Mr. Bakala's professional and business reputation, as well as increased Mr. Bakala's cost of doing business. Further, Mr. Bakala has been forced to spend money to respond to the Defendants' actions (beyond the significant expenses Mr. Bakala already has incurred in bringing this lawsuit). For example, Mr. Bakala has spent money on professional services and attorneys' fees to provide clarifications, explanations, and reassurances to his business and professional contacts (*e.g.,* Dartmouth, The Aspen Institute) in response to the false and defamatory emails and harassing phone calls those entities received from the Defendants.

**16. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

The Defendants have sent harassing, false, and defamatory statements to entities with which Mr. Bakala has a professional and business relationship, such as Blackstone Group, Round Hill Capital, Berkshire Hathaway, Amundi, The Aspen Institute, Dartmouth College and Dartmouth's Tuck School of Business, The Design Museum, and The Dox Centre for Contemporary Art. The direct result of these statements (and indeed the intended result) is harm to Mr. Bakala's professional and business reputation, damage to current and prospective business relationships, and an increased cost of doing business. Further, Mr. Bakala spent money on

attorneys' fees and professional services, separate and above the costs of this lawsuit, in responding to the statements the Defendants made to his business and professional contacts (*e.g.,* Amundi, Dartmouth, The Aspen Institute) in order to attempt to clarify and reassure these entities following the harassing, false, and defamatory statements.

17.     **List the damages sustained by reason of the violation of 18 U.S.C. § 1962, indicating the amount for which each defendant is allegedly liable.**

Defendants' unlawful conduct under 18 U.S.C. §§ 1962(c) and (d) has directly and proximately caused Mr. Bakala to suffer substantial loss and damages to his business and property.  As such, Mr. Bakala is entitled to, pursuant to 18 U.S.C. §§ 1964(a) and (c), equitable and injunctive relief, treble damages, costs, and reasonable attorneys' fees.  At this point, Mr. Bakala has not been able to quantify the full damages Defendants' conduct may have caused. The specific damages Mr. Bakala has sustained include the following:

Actual, compensatory, consequential, treble, and punitive damages for damages to Mr. Bakala's professional and business reputation and goodwill in an amount to be determined at trial, for which each Defendant is jointly and severally liable.

Actual, compensatory, consequential, treble, and punitive damages for damages to Mr. Bakala's current and prospective business relationships and business opportunities in an amount to be determined at trial, for which each Defendant is jointly and severally liable.

Actual, compensatory, consequential, treble, and punitive damages for damages sustained in the form of attorneys' fees and professional services in responding to Defendants' harassing, false, and defamatory statements to Mr. Bakala's professional and business contacts in an amount to be determined at trial, for which each Defendant is jointly and severally liable.

Actual, compensatory, consequential, treble, and punitive damages for damages sustained

in the form of weakened negotiating position in Mr. Bakala's current or prospective business relationships in an amount to be determined at trial, for which each Defendant is jointly and severally liable.

Actual, compensatory, consequential, treble, and punitive damages for damages sustained in the form of increased costs of doing business in Mr. Bakala's current or prospective business relationships in an amount to be determined at trial, for which each Defendant is jointly and severally liable.

Mr. Bakala also seeks attorneys' fees and costs, for which each Defendant is jointly and severally liable.

Finally, Mr. Bakala seeks injunctive relief, pre-judgment and post-judgment interest, and all other relief, legal or equitable, to which Mr. Bakala shows himself entitled, for which each Defendant is jointly and severally liable.

**18.    List all other federal causes of action, if any, and provide the relevant statute numbers.**

Aside from violations of RICO under 18 U.S.C. §§ 1962(c) and (d), Mr. Bakala has not alleged any other federal causes of action at this time.

**19.    List all state claims, subject to the supplemental jurisdiction of this court, if any.**

In the Amended Complaint, Mr. Bakala alleges the following non-federal claims for relief: (a) Defamation and (b) Tortious Interference.

20. **Provide any additional information that you feel would be helpful to the court in evaluating your RICO claims.**

At this time, Mr. Bakala does not believe any additional information in his possession will assist the Court. Mr. Bakala's investigation continues, however, and Mr. Bakala reserves the right to amend this statement.


Respectfully submitted,

s/ Wallace K. Lightsey
Wallace K. Lightsey

Andrew Schapiro (*Pro Hac Vice*)
*andrewschapiro@quinnemanuel.com*
Stephen Swedlow (*Pro Hac Vice*)
*stephenswedlow@quinnemanuel.com*
Margaret Haas (*Pro Hac Vice*)
*margarethaas@quinnemanuel.com*

QUINN EMANUEL URQHART &
    SULLIVAN, LLP
191 North Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400

Marshall Winn (D.S.C. 529)
*mwinn@wyche.com*
Wallace K. Lightsey (D.S.C. 1037)
*wlightsey@wyche.com*

WYCHE, P.A.
Post Office Box 728
Greenville, SC 29602-0728
Telephone: (864) 242-8200