**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| ZDENEK BAKALA, ) | |
| ) | |
| Plaintiff. ) | No. 9:18-cv-02590-DCN |
| vs. ) | |
| ) | |
| PAVOL KRUPA, ADAM SWART, and ) | **ORDER OF JUDGMENT** |
| CROWDS ON DEMAND LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

This matter came before the Court for a telephonic damages hearing on September 13, 2021, following the Court's determination that default judgment should be entered against Defendant Pavol Krupa. Counsel for the Plaintiff appeared at the hearing and presented the testimony of the Plaintiff, Zdenek Bakala, and the head of his management company, David Paul, as well as extensive documentary evidence, all bearing on the injury caused to Mr. Bakala by the wrongful conduct of Mr. Krupa. Despite notice of the hearing date and time being published on the Court's docket and provided to Mr. Krupa well in advance of the hearing, he failed to appear or to contest in any way the evidence introduced by Plaintiff.

Based on the testimony and evidence presented at the hearing, the Court orders that judgment be entered for Plaintiff against Defendant Krupa in the amount of $25,906,146.94 in actual damages, including trebled damages and attorneys' fees and costs under Plaintiff's RICO claims, plus $6,500,000 in punitive damages, for a total judgment in the amount of $32,406,146.94.

The background of this dispute and the case's procedural history leading to Mr. Krupa's default are set forth in the Report and Recommendation of U.S. Magistrate Judge Baker, ECF No.

1

197, and this Court's Order granting in part Plaintiff's motion for default judgment, ECF No 204. In short, this lawsuit arises from an international smear campaign mounted by Mr. Krupa against Mr. Bakala in an undisguised attempt to extort money from Mr. Bakala. Mr. Krupa is a Slovakian national who presently lives in the Czech Republic. Mr. Bakala is a Czech native, with dual Czech and U.S. citizenship, who lives in Hilton Head Island, South Carolina. Mr. Bakala does business in Europe and the United States and has significant personal, social, and business ties to persons and organizations in both areas.

Mr. Krupa began his campaign of harassment, defamation, and malicious interference with Mr. Bakala's family and his commercial and philanthropic relationships in 2016 in Europe. In 2017, communicating through an intermediary, Mr. Krupa offered to cease the campaign if Mr. Bakala would pay him 500 million Czech crowns, equating to approximately $23 million in U.S. dollars. At the same time, Mr. Krupa threatened to intensify and escalate the campaign by bringing it to the United States if Mr. Bakala did not meet his demands. When Mr. Bakala refused to do so, Mr. Krupa made good on his threat, engaging Defendants Adam Swart and his "astroturfing" company, Crowds on Demand LLC,[1] to continue the smear campaign against Mr. Bakala in this country, including South Carolina.

That campaign, described further below, ceased when Mr. Bakala filed this lawsuit in October of 2018,[2] although its repercussions have continued and will likely cause harm to Mr.

---

[1] "Astroturfing" companies like Crowds on Demand hold themselves out for hire to organize and implement what is meant to appear to be a grass-roots movement in support of or against a particular person or cause. In fact, the protests, telephone, and email campaigns they put together are not grass-roots at all, but rather are funded by persons or organizations with a hidden agenda and are carried out using paid actors and operatives.

[2] Plaintiff's Amended Complaint alleges causes of action for violations of sections 1962(c) and 1962(d) of the civil RICO statute, common law defamation, and common law tortious interference with prospective contractual relations. At the damages hearing, Plaintiff's counsel

Bakala indefinitely into the future.  Mr. Bakala eventually settled with Swart and Crowds on Demand, who admitted that they were hired by Mr. Krupa and acted entirely at his direction in carrying out their actions against Mr. Bakala, insisting that they were "just following Krupa's orders."  Mr. Krupa was initially represented in this action by competent U.S. counsel, but he later fired his lawyers and elected to proceed *pro se*.

In light of his *pro se* status, both this Court and U.S. Magistrate Judge Baker ensured that Mr. Krupa was informed of what was happening procedurally in this case, what he needed to do, and when he needed to do it in order to be heard.  The Court entertained and considered all of Mr. Krupa's filings, even though some were not in compliance with the rules or were made after the applicable deadline had elapsed.  He was given every opportunity to present a defense. Nonetheless, Mr. Krupa treated this Court and the rules of procedure with the same disdain and contempt he showed for the rights of Mr. Bakala.  At some point, Mr. Krupa appears to have simply lost interest.  His last submission to the Court was on March 20, 2020. ECF No. 139.  After the Magistrate Judge issued her Report and Recommendation that his preliminary challenge to personal jurisdiction be rejected, ECF No. 140 (Mar. 30, 2020), he failed to respond to multiple orders and notices from the Court rejecting his preliminary challenge to personal jurisdiction, striking his Answer, and directing him to file a proper Answer to the Amended Complaint. Consequently, after default was entered by the Clerk of Court, the Court granted in part Plaintiff's motion for default judgment and scheduled an evidentiary hearing on damages.

The standards for default judgment and the parameters of the damages for which Mr. Bakala could seek recompense were outlined in this Court's Order granting in part Plaintiff's

---

advised the Court that Plaintiff was not pursuing damages on his tortious interference claim. Because damages is an essential element of that claim, the court dismisses it sua sponte.

3

motion for default judgment, *see* ECF No. 204. As noted there, once the clerk has entered default against a defendant, the court accepts the well-pleaded factual allegations of the plaintiff when considering a motion for default judgment. The defendant in default, however, is not held to have admitted conclusions of law or allegations that concern only damages. Thus, a court considering default judgment must determine whether the established factual allegations constitute a legitimate cause of action and provide a sufficient basis for the relief sought. *Id.* Further, this Court held in its Order that an evidentiary hearing was warranted in order to determine an appropriate amount of damages, and invited Plaintiff to present evidence as to the following:

- With respect to Plaintiff's RICO claims,
    - injury to his "business or property," including:
        - damage to his business or professional reputation, and
        - expenses incurred for professional services and attorneys' fees to respond to the defamatory communications made by the Defendants and to engage in "damage control," such as providing clarifications, explanations, and reassurances to his business and professional contacts; and
    - his attorneys' fees and costs in this action.
- With respect to Plaintiff's defamation claim,
    - injury to Plaintiff's reputation, and
    - mental suffering, emotional distress, humiliation, and anxiety.

*See* ECF No. 204, at 9-14, 18-19.

At the damages hearing, the Plaintiff presented compelling testimony by Mr. Bakala and Mr. Paul, supported and amplified by documentary exhibits, demonstrating the severe reputational

harm, economic and financial loss, and emotional injury that were caused by Mr. Krupa's wrongful and malicious actions against Mr. Bakala. The extortion campaign that Mr. Krupa initiated, participated in, funded, and directed consisted of actions such as the following:

(1) *Publishing numerous false allegations* in Europe and the U.S. that Mr. Bakala was a criminal and a scammer; that he had bribed government officials, committed financial fraud, falsified financial records, engaged in self-dealing, and bankrupted a company in which he had invested; and that his actions caused thousands of Czech coal miners to be turned out of their homes. *See* Plaintiff's Exhibits 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 24, 28, 29. There was no truth to these allegations, and Mr. Krupa knew that there was no truth to the allegations but published them anyway.

(2) *Inciting threats of violence* against Mr. Bakala and his family, including death threats and assertions that Mr. Bakala should be shot, hanged, decapitated, and dismembered. Threats and statements like these were promoted on a Facebook page bearing a domain name registered to Mr. Krupa's company, Arca Capital, and were encouraged and "liked" by the administrator of the page. *See* Plaintiff's Exhibits 1, 2.

(3) *Organizing a protest in front of Mr. Bakala's home in Switzerland*, where he and his wife and four young children were living at the time. Mr. Krupa offered to provide free transportation to protestors, threatened to bring in notoriously violent "soccer hooligans" from Moravia to participate in the protest, published a photograph of the home to make it easy to find, promoted the protest in the media, and warned that it could turn violent. Although Mr. Krupa's application for a permit for the protest was turned down by the Swiss authorities and the protest ultimately did not occur, his efforts succeeded in that they garnered substantial media attention and publicity of the false allegations being

5

propagated, resulted in individuals showing up and trespassing at Mr. Bakala's home – including one instance that occurred while Mr. Bakala's young daughter was returning from school – and led Mr. Bakala to move his family away from the home to protect their safety. *See* Plaintiff's Exhibits 3, 4.

(4)  *Filing baseless criminal complaints* against Mr. Bakala, including false charges made to (among others) the United Kingdom's Financial Conduct Authority and Serious Fraud Office, and orchestrating numerous civil suits against him.[3]  These proceedings were covered in the news media, and those reports led the Swiss bank where Mr. Bakala and his local business maintained their accounts to freeze their funds there for over two years, resulting in significant expense and financial difficulty for the business and for Mr. Bakala personally. Although all of the criminal proceedings were ultimately resolved in his favor, with the investigating authorities determining that the charges were baseless, they took five years to work their way through the process and were concluded only recently. *See* Plaintiff's Exhibits 5, 6, 7, 24, 25, 28, 29.

(5)  *Using the pending criminal proceedings, and making false statements about them, in attempts to strong-arm others* into ceasing or refraining from doing business with Mr. Bakala or his company and removing him from various charitable boards on which he sat. *See* Plaintiff's Exhibits 8, 9, 10, 11, 12, 13.

(6)  *Inundating organizations in the United States and Europe with which Mr. Bakala was affiliated with phone calls and emails* accusing Mr. Bakala of being a criminal and a fraud, urging those organizations to sever their ties with him, and threatening protests

---

[3] Although the civil suits were filed by other persons, Mr. Krupa promised that he could "make them go away" if Mr. Bakala acceded to his extortion demand.

6

at their offices if they did not do so. These organizations included Berkshire Hathaway, The Blackstone Group, Round Hill Capital, Dartmouth College, the Tuck School of Business at Dartmouth, the Aspen Institute, the Design Museum in London, the Dox Centre for Contemporary Art in Prague, and the Vaclav Havel Library in Prague. *See* Plaintiff's Exhibits 9, 10, 11, 12, 13. It is worth noting that that the detailed allegations sent to the Aspen Institute by Swart himself, having been provided by Mr. Krupa, match nearly verbatim the complaints that Mr. Krupa sent to the United Kingdom's Financial Conduct Authority and Serious Fraud Office. In addition to Swart's admissions, this evidence shows clearly that Mr. Krupa was directing the Crowds on Demand campaign.

(7)     *Organizing protests using paid actors near Mr. Bakala's home on Hilton Head Island and outside of the school attended by his children there*. The actors participating in the protests carried signs and chanted slogans accusing Mr. Bakala of being a criminal, a fraud, and the "Scammer of the Decade." *See* Plaintiff's Exhibit 14. Similar protests, with similar false and defamatory accusations, were staged near the offices of other entities with which Mr. Bakala was affiliated in the United States, including M&T Bank's offices in Buffalo and New York City and Berkshire Hathaway's headquarters in Omaha, Nebraska.

While it took place on two continents, this was a unified campaign, a campaign with a single and common purpose: to force Mr. Bakala to yield to Mr. Krupa's extortion demand and pay Mr. Krupa $23 million to stop the harassment and defamation. The events, protests, publicity, and criminal proceedings in Europe were hyped and leveraged in the actions being carried out in the United States. Likewise, publicity about the "protests" in the U.S. was used to further stigmatize Mr. Bakala in Europe and particularly in the Czech Republic.

Because of Mr. Krupa's actions, Mr. Bakala incurred substantial expense to fight the criminal charges against him, to combat the false and highly defamatory portrait of him being promulgated in the media and the public eye, and to defend himself against the slanderous comments made about him through the email and telephone bombardment of organizations with which he was affiliated. *See* Plaintiff's Exhibits 15, 17, 18, 19, 20, 21, 22, 23, 26, 27. He suffered severe distress and anxiety over the embarrassment and humiliation being caused to him and to his family and associates. He had great concern, legitimately so, for the physical safety of himself, his wife, and his young children.

Significantly for the purposes of this Order, his personal and professional reputation has been permanently marred. Mr. Bakala spent his entire career building his reputation as an ethical, honest, and talented business professional and a decent and caring person, and he was widely viewed as such in international circles. He was viewed in his native country as someone who had helped bring a market-based economy and democratic principles and values to the Czech Republic following the collapse of communism in that country.[4] Now, even after successfully defeating the criminal actions and proceedings brought against him, the Bakala name is considered "toxic" in

---

[4] Mr. Bakala emigrated to the U.S. from then Czechoslovakia at the age of nineteen in order to pursue better educational and career opportunities here, and he became a U.S. citizen in 1986. While working as a dishwasher and learning English, Mr. Bakala began taking courses at a community college and later transferred to and graduated from the University of California, Berkeley. He then earned an MBA degree from the Tuck School of Business at Dartmouth College. Following the collapse of the Soviet-style communist regime in Czechoslovakia during the "Velvet Revolution" of the early 1990s, Mr. Bakala returned to Czechoslovakia, later the Czech Republic, to open Credit Suisse's first office in that country. Mr. Bakala left Credit Suisse in 1994 to co-found the Czech Republic's first private investment bank, Patria Finance. This company played a significant role in the privatization of the Czech economy and was instrumental in the sale of the national automobile company, Skoda, which preserved tens of thousands of jobs in the Czech Republic and is now the largest private employer in the country. His business and philanthropic activities that followed have promoted economic progress, a free press, and democratic values in his native land.

8

central and western Europe, and former friends and associates shun him and those who work with him. His reputation was impugned by fake protestors in front of his home and his children's school on Hilton Head Island. Friends and associates in the United States and abroad have been bombarded with phone calls and emails labeling Mr. Bakala a criminal and a fraud. The injury Mr. Bakala has suffered from the calculated campaign waged against him by Mr. Krupa calls for an award of substantial damages, and it is this Court's obligation to make such an award. As Justice Potter Stewart once observed:

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty.

*Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring).

Based on the evidence and the facts proven by the Plaintiff, the Court finds that the following compensatory damages, attorneys' fees, and costs are reasonable and properly recoverable under the law of the respective causes of action asserted. All of the specific monetary amounts included in this list are supported by the testimony of Mr. Bakala and Mr. Paul and the Plaintiff's documentary evidence, including invoices for the services of the lawyers and other professionals listed below. Explanations of the work provided by the law firms and professional service firms listed in part 1 below are set forth in Plaintiff's Exhibit 15 and were further described in the testimony of Mr. Paul. The supporting invoices and other documentation were introduced as Plaintiff's Exhibits 17-23 and 26-27. The amounts awarded for defamation damages in part 2 are what Mr. Bakala testified to be fair compensation for the injury he suffered, and the Court finds these amounts to be just and reasonable. Documentation and itemized support for the attorneys' fees and costs listed in part 3 are included with the Supplemental Declaration of Marshall Winn in Support of an Award of Attorneys' Fees and Costs. ECF No. 208.

1. **RICO Damages Pursuant to 18 U.S.C. § 1964(c).**

    | $815,286.60 | Wyche P.A. |
    | $66,259.89 | Nelson Mullins Riley & Scarborough LLP |
    | $371,040.02 | Aubert Neyroud & Stuckelberg |
    | $503,264.55 | BianchiSchwald Sarl |
    | $24,360.29 | JUDR. Jiri Cisar, advokat |
    | $72,293.80 | Kim Mauerhofer, lic. iur. |
    | $1,341,366.57 | News First Ltd |
    | $41,263.00 | PRK Partners s.r.o. |
    | $62,205.29 | Barclays Bank Switzerland |

    **$3,297,340.01     Total RICO Damages**

2. **Defamation Damages.**

    $10,000,000.00    Damages for Injury to Reputation

    $3,000,000.00    Damages for Emotional Distress and Embarrassment

    **$13,000,000.00     Total Defamation Damages**

3. **Attorneys' Fees and Costs Pursuant to 18 U.S.C. § 1964(c) and Local Civil Rule 54.03.**

    | $1,168,609.50 | Attorney Fees for Wyche P.A. |
    | $26,258.95 | Costs Incurred by Wyche P.A. |
    | $1,744,992.50 | Attorney Fees for Quinn Emanuel Urquhart & Sullivan, LLP |
    | $42,410.96 | Costs Incurred by Quinn Emanuel Urquhart & Sullivan, LLP |
    | $31,855.00 | Costs Incurred by Mr. Bakala for litigation travel expenses |

    **$3,014,126.91     Total Attorneys' Fees and Costs**

In determining what is a reasonable award of attorneys' fees, Fourth Circuit jurisprudence sets forth twelve factors to be considered (though the court need not rigidly apply each factor). Those factors are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation [i.e., whether the fee is fixed or contingent]; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fee awards in similar cases.

*Robinson v. Equifax Info. Services, LLC*, 560 F.3d 235, 243-44 (4th Cir. 2009) (quoting *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir.), *cert. denied*, 439 U.S. 934 (1978)).

These factors apply to this case as follows:

(a)     <u>Time and Labor</u> – Plaintiff's counsel has submitted a detailed accounting and description of the services rendered and the expenses incurred in this case. The total amount of time and labor required on this matter for which fees are sought is reasonable, considering in particular the number and complexity of the issues and motions that arose during the course of this case.

(b)     <u>Novelty and Difficulty</u> – The factual background of this case is quite novel and Mr. Krupa's conduct in the litigation presented unique challenges to the prosecution of the case. Furthermore, the legal issues that arose in connection with Plaintiff's RICO claims and the issue of personal jurisdiction over Mr. Krupa were complex and of a high analytic level.

(c)     <u>Skill Required</u> – The challenges that were presented to a successful prosecution of this case required skilled and effective advocacy and legal representation.

(d)     <u>Opportunity Costs</u> – The substantial amount of time required of Plaintiff's counsel to pursue this case to a successful completion precluded them from undertaking other work that, as well known and highly regarded attorneys, would otherwise have been available to them.

(e) <u>Customary Fee for Like Work</u> – The Court finds that the rates charged by Plaintiff's counsel in this case are consistent with those charged for complex litigation of a similar nature in the jurisdictions and regions in which Plaintiff's counsel practice.

(f) <u>Whether the Fee is Fixed or Contingent</u> – The fees charged to, and paid by, Mr. Bakala were rendered on an hourly rate basis.

(g) <u>Time Limitations</u> – Mr. Krupa's threat to bring in-person protests to Dartmouth College at the beginning of the academic year there required prompt action by Plaintiff's counsel to prepare and initiate this lawsuit.

(h) <u>Amount in Controversy and Results Obtained</u> – The amount in controversy was quite substantial. Mr. Krupa was demanding payment of $23 million to cease his smear campaign and was targeting his efforts so as to inflict maximum pain and injury upon Mr. Bakala in order to force him to capitulate. The litigation not only vindicated Mr. Bakala's rights against Mr. Krupa's calculated and malicious attack, but also succeeded in bringing an end to it. The vindication of these rights confers a benefit that inures to our entire society and that is not measurable in monetary terms.

(i) <u>Counsel's experience, reputation and ability</u> – Plaintiff's counsel are well known as skilled and successful lawyers, and have substantial experience handling litigation of this nature.

(j) <u>Undesirability</u>. Not applicable.

(k) <u>Professional Relationship Between Attorney and Client</u> – Plaintiff's counsel (both the South Carolina and out-of-state firms) have a long-standing professional relationship with Mr. Bakala.

(l) <u>Awards in Similar Cases</u> – Fee awards of the magnitude ordered here are comparable to those in other RICO cases similar to the instant case. *See, e.g., Wimbledon*

12

*Financing Master Fund, Ltd. v. Weston Capital Management LLC,* No. 653468/2015, 2019 WL 6716377, at *11 (N.Y. Sup. Ct. Dec. 10, 2019) ("The award of attorneys' fees under RICO is mandatory. The judgment against Galanis on the RICO claims should include an award of $3,928,022.74 in attorneys' fees and expenses.").

Based upon all of the relevant considerations, the Court finds that $2,913,602.00 is a reasonable lodestar amount for an award of attorneys' fees in this case. The Court further finds that the costs sought, amounting to $100,524.91, are reasonable and proper under RICO, 18 U.S.C. § 1964(c), and Local Rule 54.03, D.S.C. Accordingly, the Court hereby awards $3,014,126.91 for attorneys' fees and costs.

In addition to the above, treble damages under RICO are "remedial in nature" and designed to provide a remedy for injuries suffered as a result of the prohibited conduct. *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405-06 (2003). Given the nature of Mr. Krupa's outrageous conduct and the severe harm it caused Mr. Bakala in his business and property, including his professional reputation, the Court finds that trebling of the RICO damages is fully warranted here. Accordingly, the Court will treble the RICO damages of $3,297,340.01, for a total RICO award of $9,892,020.03.

Further, as to the defamation cause of action, the Court finds that punitive damages are appropriate under South Carolina law, given the willful and wanton nature of Mr. Krupa's wrongdoing.[5] Applying the multi-factor analysis established by the seminal decision in this state,

---

[5] *See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989) ("In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law."); *accord Hoskins v. King*, 676 F. Supp. 2d 441 (D.S.C. 2009) (the substantive law of punitive damages, in terms of whether punitive damages are appropriate and what factors may or should be considered in making such a determination, is a matter of state law as to state law causes of action).

*Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991), the Court makes the following findings:

(1) <u>The defendant's degree of culpability</u>. The actions taken against Mr. Bakala are extreme, outrageous, and reprehensible; they were undertaken with the specific intent and purpose of causing emotional distress and injury to Mr. Bakala's family and reputation; and they were all undertaken by Mr. Krupa himself or at his direction and behest.

(2) <u>The duration of the conduct</u>. Mr. Krupa's smear campaign lasted more than five years.

(3) <u>The defendant's awareness or concealment</u>. Mr. Krupa was aware of what was happening and was orchestrating and directing the campaign against Mr. Bakala at every step.

(4) <u>The existence of similar past conduct</u>. Plaintiff presented testimony that Mr. Krupa is known in Central Europe as a "shakedown artist" and has attempted similar extortion schemes against others in Europe and the United States.

(5) <u>The likelihood that the award will deter the defendant or others from like conduct</u>. The amount to be awarded is sufficient to have a meaningful deterrent effect on Mr. Krupa and others.

(6) <u>Whether the award is reasonably related to the harm likely to result from the conduct</u>. The amount awarded is a fraction of Mr. Bakala's actual damages and is proportional to the severe harm caused to Mr. Bakala.

(7) <u>The defendant's ability to pay</u>. Plaintiff was unable to conduct discovery of Mr. Krupa due to the procedural history of this case, and therefore was unable to submit particularized evidence on this factor. However, Plaintiff did submit evidence of public statements by Mr. Krupa in which he held himself out as a billionaire. These statements are admissions of a party opponent and therefore are admissible evidence against Mr. Krupa on this issue. *See* F.R.E. 801(d)(2). With these statements by Mr. Krupa accepted at face value, the punitive damage award must be of

sufficient magnitude to effect a meaningful deterrent to a self-professed billionaire while not causing bankruptcy. The punitive damage award entered herein is of such an amount and is proportional to the harm caused.

(8) <u>Other factors deemed appropriate</u>. Under the Fourth Circuit Court of Appeals' decision in *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir. 1991), the Court also has considered the relationship of the punitive damage award to actual damages and to Mr. Krupa's wealth and ability to pay, the actual harm caused, and the incentive to Mr. Krupa to commit the wrongdoing, all of which are addressed above. As to the *Mattison* factor of whether there are other related penalties available to punish defendant, there are none other than the treble damages awarded under Plaintiff's RICO cause of action, which the Court incorporates into the award by taking the additional amount that results from trebling the RICO damages and reducing by that amount the punitive damages that would otherwise be awarded.

Considering all of the *Gamble* and *Mattison* factors and the Court's decision to treble Plaintiff's RICO damages, the Court finds that $6,500,000 – equivalent to half of the actual damages suffered from Mr. Krupa's defamation – is a reasonable award of punitive damages and is fully within the due process constraints on punitive damages set forth by the United States Supreme Court. *E.g., BMW v. Gore*, 517 U.S. 559 (1996); *Pacific Mutual Life Insurance Co. v. Haslip*, 111 S. Ct. 1032 (1991); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S. Ct. 1513, 1524 (2003) ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages … will satisfy due process."). The Court also notes that the total award of damages and the ratio of punitive to compensatory damages are comparable to the results in similar cases in South Carolina and elsewhere.

> As to the ratio of the general damages award to the punitive damages award, our appellate courts have many times affirmed a 2:1 ratio for punitive to actual

15

> damages. Here, the punitive damages award was slightly less than twice actual damages.
>
> In looking to comparative cases, there are *Limehouse v. Hulsey*, 723 S.E.2d 211, 227 (Ct. App. 2005) with a 2:1 ratio, *Duncan v. Ford Motor Co.*, 682 S.E.2d 877, 891 (Ct. App. 2009) with a 6:1 ratio, and *Mitchell v. Fortis,* with a 9:1 ratio, all upheld.

*Coffey v. Community Services Assoc., Inc.,* No. 2011CP0700013, 2012 WL 10861825, at *2 (S.C. Com. Pl. Oct. 15, 2012). In *Limehouse v. Hulsey*, *supra,* the South Carolina Court of Appeals affirmed an award of $5 million in punitive damages for a claim of defamation decided after a damages hearing where the defendant went into default.[6] Similarly, in *Cohen v. Hansen,* Case No. 2:12-01401-JCM (D. Nev. Mar. 1, 2016) (ECF No. 331), the District Court entered judgment of $38.3 million in actual and punitive damages in a defamation case analogous to the instant one, and that judgment was affirmed by the Ninth Circuit Court of Appeals.

In sum, the Court enters judgment for Plaintiff as follows:

1. $3,297,340.01 for compensatory damages under the RICO claims, trebled to $9,892,020.03.
2. $13,000,000 for injury to reputation and emotional distress under the defamation claim.
3. $3,014,126.91 for reasonable attorneys' fees and costs incurred in this action.
4. $6,500,000 for punitive damages.

These figures come to a total award of $32,406,146.94.

Accordingly, for the reasons stated above and in this Court's Order granting in part Plaintiff's Motion for Default Judgment,

---

[6] The jury returned a verdict for actual damages in the amount of $2.39 million; therefore, the punitive award in *Hulsey* was more than twice the compensatory damages.

**IT IS HEREBY ORDERED** that judgment be entered for the Plaintiff against Defendant Krupa in the amount of Thirty-Two Million Four Hundred Six Thousand One Hundred Forty-Six and 94/100 dollars ($32,406,146.94).

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 20, 2021**
**Charleston, South Carolina**